[No. A021109. First Dist., Div. Two. Sept. 24, 1985.]

MIREYA DULCE GALSTER et al., Plaintiffs and Appellants, v.
MARION J. WOODS, as Director, etc., et al.,
Defendants and Respondents.

[No. A020975. First Dist., Div. Two. Sept. 24, 1985.]

MIREYA DULCE GALSTER et al., Petitioners, v.
THE SUPERIOR COURT OF HUMBOLDT COUNTY, Respondent;
MARION J. WOODS, as Director, etc., et al., Real Parties in Interest.

530

## COUNSEL

Stephen R. Nielson, Jacob J. Smith, Sheryl Studley, Eleanor Eisenberg and John M. Maraldo for Plaintiffs and Appellants and Petitioners.

John K. Van de Kamp, Attorney General, Richard D. Martland, Chief Assistant Attorney General, Thomas E. Warriner, Assistant Attorney General, Charlton G. Holland, John J. Klee, Jr., and Winifred Y. Smith, Deputy Attorneys General, for Defendants and Respondents and Real Parties in Interest.

No appearance for Respondent Court.

## OPINION

**SMITH, J.**—The question posed on this appeal and petition for writ of mandate is whether state officials charged with implementing and administering the aid to families with dependent children (AFDC) program may, consistently with federal and state law, deem a property interest held by an applicant or recipient to be "available" for support and maintenance, and hence countable in computing dollar-amount "resource" limits governing eligibility for benefits, when the applicant or recipient has demonstrated that, despite diligent and good faith efforts to sell or otherwise gain access to that resource, the resource is not actually "available." Specifically at issue is the policy of respondents whereby a property interest is deemed an available resource so long as there is no legal impediment to its liquidation and without regard to its practical or actual availability. Pursuant to that policy, each of the four applicants/recipients herein was deemed to have an available real or community property interest resource valued at over $1,000, the current resource limitation, and was therefore denied AFDC

benefits notwithstanding claimed actual unavailability of those resources. All four applicants/recipients timely appeal from a judgment of the superior court denying their request for a preliminary injunction. (Code Civ. Proc., § 904.1, subd. (f).) Pending appeal, they have also petitioned for mandamus relief. For sake of simplicity, they are referred to herein as appellants, and respondents/real parties in interest as respondents.

## BACKGROUND

Mireya Dulce Galster separated from her husband in June 1982, leaving the family residence and taking with her her six children. Finding herself without income, funds from her husband or any other means to meet the needs of herself and the children, she applied in Humboldt County for AFDC benefits but was denied them because her community property interest in the family home that she no longer occupied was nonexempt and exceeded $1,000 in value.[1] She promptly challenged denial of her application by requesting, on August 16, 1982, a hearing by the Department of Social Services (DSS) (see Welf. & Inst. Code, § 10950 et seq.), and a hearing was scheduled for September 23. Meanwhile, she obtained legal counsel, who made a written request for the basis of the denial and received in response copies of three documents from DSS or county welfare departments outlining a policy of assuming the availability of community property interests absent a legal barrier such as a court-ordered restraint on their disposition pending dissolution proceedings.[2] Counsel subsequently con-

---

[1] The record is lacking in specific facts as to Mrs. Galster such as what circumstances caused her to leave the residence, what were her husband's reasons for not helping her financially and by how much the value of her community property interest exceeded $1,000. The declaration of a county social worker does show that she was destitute and that she sought legal advice in regard to obtaining assets or support through initiating dissolution proceedings.

[2] A July 23, 1982, memorandum addressed to AFDC eligibility supervisors at the Humboldt County Department of Public Welfare advises:

"Effective immediately the community property interest of clients in an absent spouse's property is to be considered available and included in his/her property reserve. . . .

"The only exception to the availability of the property is if there is a *legal barrier* to the client's obtaining his/her share. Filing for divorce or a legal separation would not be sufficient, since the property can still be liquidated. An interlocutory decree or temporary restraining order which specifically makes the property unavailable would be sufficient. Another example would be if the client was a co-tenant in a piece of property and the other co-tenants refuse to either buy his/her interest or let it be sold.

"Intake is already operating under this new state policy. Ongoing should start reviewing for cases with community property as soon as possible since we have some ineligible cases currently receiving aid. Cases still receiving aid after August 31, 1982 who are ineligible due to excess property will be charged with administrative error property overpayments starting September.

"Questions about what constitutes a legal barrier or extenuating case circumstances may be referred to the Program Validation Unit [PVU]."

A second document, a "PVU Inquiry/Response Control" form from the DSS Program

firmed, by a telephone conversation with DSS legal counsel, that the action taken on Mrs. Galster's application was consistent with current state policy which was then under review and which had not yet been promulgated as a formal written regulation.

The record does not reveal that DSS took formal action on Mrs. Galster's request for hearing. However, appellate counsel represents that Mrs. Galster filed for dissolution of her marriage in late September 1982 and obtained a court order restricting disposition of the community property, thereby rendering her interest in that property unavailable by respondents' criteria. (See fn. 2, *ante.*)

The remaining appellants share a common background. Each of their families received AFDC benefits until, in May and July of 1982, those benefits were terminated following county-level determinations that each possessed excess, nonexempt real property resources. Each requested and obtained a hearing to review those terminations, but all three proceedings resulted in proposed decisions recommending denial of their claims. Respondent Marion J. Woods, as director of DSS,[3] adopted the proposed decisions on June 16 and 24, and on September 7, 1982.

Appellant Jo Anna Kronsperger-Smith was found ineligible because she owned an unimproved lot in Lake County assessed by the county assessor's office at $1,819. The lot is inaccessible from paved roads, lies in mountainous terrain and, due to its small size—about 5,400 square feet—was subject to county restrictions forbidding the installment of a septic tank or well. She, along with her husband and two young children, had lived on the lot,

---

Operations Bureau in response to a local agency's question regarding the availability of community property as a countable resource, confirms, "If *legal* barrier—not available. Otherwise available immediately . . . ."

Finally, a May 24, 1982, letter from DSS to the Director of the Shasta County Welfare Department answers a hypothetical question posed by the director:

"QUESTION #1

"Example: Woman has separated from husband, leaving him in home owned in joint tenancy. Divorce action has been filed, property settlement is pending. How do we treat the 'other real property,' consisting of her community interest in the value of the home? Does the pending court action on the divorce make it unavailable to her until a settlement is reached? Would a 'tenants in common' holding change the determination? How should it be considered if there is only a separation, and no legal action has been taken?

"ANSWER

"In the example given, the value of the community interest in the property would be used for making a determination for AFDC-FC eligibility. Until the property settlement is determined, or unless an interim court order exists enjoining the parties from distribution, sale or encumbrance, the applicant's/recipient's community property would be assumed to be available under current policy."

[3]Mr. Woods is no longer the DSS director, although, for convenience, he is referred to in this opinion as respondent Woods. (*Darces* v. *Woods* (1984) 35 Cal.3d 871, 878, fn. 2 [201 Cal.Rptr. 807, 679 P.2d 458].)

apparently in an eight-by-ten foot metal shed without running water or electricity, from June 1980 to March 1982, when she was informed by a representative of a child protective services agency that her living environment was inappropriate for the children. Shortly thereafter, the family moved off the lot to Mendocino County, and appellant had her AFDC grant transferred to that county. She was notified on June 3d that AFDC benefits would be discontinued due to her interest in the Lake County lot.

After her benefits were denied, she sought a hearing, maintaining that the lot was uninhabitable and, moreover, unsalable despite unsuccessful attempts since April 1981 to sell it at market price. A letter from a realtor with whom she had listed the property for sale stated that the land was unusable and that one would be fortunate to get $1,000 for it. Letters from a second realtor, whose office was not taking listings in that area "because they are almost impossible to sell," stated that there was no present market for the property and that it would be hard to sell for over $1,000. The hearing officer's proposed decision recognized the claim of unsalability but nevertheless sustained the county's action since Mrs. Kronsperger-Smith's property was assessed at more than $1,000 and was free of offsetting encumbrances.

Appellant Rohana Williams had been receiving AFDC benefits in Santa Cruz County as the sole caretaker parent for two children when, in April 1982, she received notification that her benefits would be terminated due to her ownership of an unimproved parcel of land in Siskiyou County having a market value of $7,100 as shown on a 1978-1979 tax statement. At her hearing challenging the benefits termination, Ms. Williams evidently presented evidence that she had tried unsuccessfully to sell the property at prices as low as $6,500. However, the hearing officer concluded that, even assuming that that lower value were fair and that there were encumbrances totaling as much as $1,000, the property exceeded the maximum eligibility limitation, and the county therefore properly discontinued benefits. The hearing officer did find, however, that Ms. Williams "had made continuous good faith efforts to sell the property, both by listing that property with realtors, attempting to sell it herself through advertisements in the newspaper, and attempting to sell the property by posting signs and other indicia that the property was for sale."

Appellant Robyn Burros was receiving AFDC benefits in Santa Cruz County for a household consisting of herself, her husband and their two sons. She received notice of discontinuance of benefits effective April 30, 1982, based on her ownership of land in Oregon, where the family had previously lived until January 1979, when they had moved due to a lack of work prospects in that area. The hearing officer in her case found that the

property "consists of approximately four and one-half acres of isolated property. There is a cabin on the property, which has been repeatedly vandalized. The claimant had made repeated good faith efforts to sell the property on an intermittent basis" beginning in 1975, at prices of $18,000, $25,000 and, most recently, at between $15,000 and $17,000 since 1981. The hearing officer concluded that, based on a property value of $15,000 less $2,000 in encumbrances, the net market value exceeded $1,000, and Mrs. Burros was "ineligible for AFDC benefits, despite her good faith efforts to sell that property."

On September 20, 1982, appellant Galster initiated the instant proceedings by filing, both as an AFDC applicant and as a taxpayer (Code Civ. Proc., § 526a), a complaint and petition in Humboldt County Superior Court, seeking injunctive and declaratory relief and a writ of mandate. The court denied a requested temporary restraining order on September 28, finding the issue essentially moot as to Galster because she had in the meantime become eligible once again for benefits due to having obtained an order restraining the transfer of her community property pending dissolution proceedings, but the court nevertheless scheduled a hearing on the preliminary injunction.

Amendments to the pleadings were filed on October 4, adding Williams, Burros and Kronsperger-Smith as parties (plaintiffs and petitioners), adding allegations as to them and seeking administrative mandamus review (Code Civ. Proc., § 1094.5) of their final DSS-adopted determinations. The matter of the preliminary injunction was heard and submitted on November 18 and the court filed its ruling denying the injunction on December 10, 1982. Implicit in that ruling was also a denial of mandamus relief. Notice of appeal was filed on January 18, 1983.

On January 24, 1983, appellants petitioned for extraordinary relief in this court, seeking mandamus and a temporary stay of the trial court's judgment. Division Three (Poché, J., dis.) summarily denied the petition on February 7, and appellants thereafter petitioned for a hearing in the Supreme Court. By an order filed April 6, that court granted their petition, transferred the matter to itself, "stayed" respondents' denial of AFDC benefits to "any applicant" pending final disposition, and retransferred the matter to this court.[4] We consider the writ petition along with the appeal since each poses the identical issues.

---

[4]The Supreme Court's order states in part: "Pending final disposition of this proceeding, real parties in interest [respondents] are stayed from denying benefits to any applicant for [AFDC] on the ground that such applicant owns a property right of a market value in excess of $1,000 . . . if that property right is not, *as a practical matter,* 'available for the use [of] or expenditure by or in behalf of the applicant. . . .'" (Quoting Welf. & Inst. Code, § 11155, subd. 4.)

## DISCUSSION

### I

It is helpful at the outset to borrow the following ground-laying excerpts from Justice Reynoso's recent opinion for the California Supreme Court in *Vaessen* v. *Woods* (1984) 35 Cal.3d 749, at pages 754 to 756 [200 Cal.Rptr. 893, 677 P.2d 1183]: "AFDC was established by the Social Security Act of 1935. (42 U.S.C. § 601 et seq.) It is jointly funded by the federal government and the states and is administered by the states in a scheme of 'cooperative federalism.' [Citation.] While state participation is elective, federal funding is conditioned on program compliance with the Social Security Act (Act) and applicable federal regulations. (See 45 C.F.R. § 233.10 et seq.) California participates under the terms of Welfare and Institutions Code section 11200 et seq. [¶] One of four categorical assistance programs established by the Act, AFDC provides financial assistance to families in which a dependent child is in need of financial support because of the absence, disability or unemployment of a parent. (See 42 U.S.C. §§ 606(a), 607, 608; Welf. & Inst. Code, §§ 11250, 11251.) [¶] . . . [¶] In determining a family's need for financial assistance, the federal statute requires the states to consider income and resources other than AFDC payments which are available to the needy child or relative claiming aid. (42 U.S.C. § 602(a)(7).)"

The last cited provision of the Social Security Act mandates in part that an administering or supervising state agency such as the DSS "shall determine ineligible for aid any family the combined value of whose resources (reduced by any obligations or debts with respect to such resources) exceeds $1,000 or such lower amount as the State may determine, . . ." (42 U.S.C. § 602(a)(7)(B).) California has opted for the full authorized exemption of $1,000. (Welf. & Inst. Code, §§ 11155 and 11257.)[5]

Section 233.20(a)(3)(ii)(D) of the Code of Federal Regulations currently implements the federal act in this language: "Income . . . and resources *available for current use* shall be considered. . . . Income and resources are considered *available* both when *actually available* and when the applicant or recipient has *a legal interest in a liquidated sum and has the legal ability*

---

[5]The federal statute and regulations exempt, for purposes of the resource limitation, "a home owned and occupied" by a member of the assisted family or one living with them in the home, irrespective of the home's value (42 U.S.C. §§ 602(a)(7)(A) and 602(a)(7)(B); 45 C.F.R. § 233.20(a)(3)(i)(B)(*l*)), and California law necessarily also reflects that exemption (Welf. & Inst. Code, § 11257, subd. (b)(1)).

*to make such sum available for support and maintenance. . . .*"[6] (Italics added.) The controversy in this case centers on disagreement over the meaning of the italicized language. Adopting a narrow interpretation, respondents contend that a legal interest in property must be deemed available for support and maintenance once it is shown to be legally available, despite any practical obstacles to its "current" or "actual" availability. Appellants contend that "current" or "actual" availability remains an overriding requirement in federal and state policy which precludes respondents' interpretation.

Appellants do not challenge any state or federal statute or regulation; they simply seek to invalidate, as inconsistent with those expressions of policy, respondents' recently begun practice of looking solely to "legal" availability when determining eligibility. Also not challenged is the question of valuation; that is, appellants do not deny that their property interests were correctly valued at over $1,000 and do not contend that the evidence of practical inaccessibility or unsalability which they presented should have been recognized as countering those valuations.[7] Further, appellants emphasize that they are not seeking to tie the term "available" with the term "liquidated sum" under the federal regulation and state statute. They therefore implicitly concede that a nonliquid asset (see definition of "liquid assets" in 45 C.F.R. § 233.20(a)(3)(ii)(F)(4)) such as unsold realty, stocks, bonds, etc., may be deemed available.[8] Finally, appellants vigorously deny claiming "that they should be allowed to hold their resources indefinitely or until they can sell them at a profit, at market value, or even at below market value"; they state, rather, that they are willing to comply with "any reasonable regulation" which would require them to take action to render their resources available [whether] by sale, by institution of divorce [dissolution of marriage] proceedings, or by any other available actions." The

---

[6]The following italicized portion of our state's Welfare and Institutions Code section 11257, subdivision (a), is identical to the federal regulation except for omission of the word "available" (supplied in brackets for comparison): "For purposes of this subdivision, real and personal property shall be *considered* [available] *both when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make that sum available for support and maintenance.*" (Italics added.)

[7]Respondents therefore miss the point when they suggest steps which each might have taken to reduce her estimated adjusted fair market value (Welf. & Inst. Code, § 11257, subd. (a)) or "equity value" (45 C.F.R. § 233.20(a)(3)(ii)(E)), or urge that the parcels of land here in question might have been sold for lower asking prices. Because respondents evidently considered good faith efforts to convert the resources to cash proceeds irrelevant, there is no reason to believe that appellants' cases would have come out differently upon a greater showing of good faith or effort.

[8]Both the federal regulation and the California statute premise availability in part on the applicant having "a legal interest in a *liquidated sum* . . ." (italics added; 45 C.F.R. § 233.20(a)(3)(ii)(D); Welf. & Inst. Code, § 11257, subd. (a)), yet an interpretation that recognized only resources already converted to cash as "available" would produce the absurd result that one could have endless realty investments and still qualify for AFDC assistance. Contrary to respondents' assertion, appellants do not make such a claim.

essence of their contention is that AFDC applicants and recipients must be given some opportunity to show that their excess real property resources are, despite the absence of formal legal barriers, not actually available to meet their current support and maintenance.

As will be seen, we will agree with appellants that respondents' policy was invalid as inconsistent with federal and state law policy manifest at the time of the proceedings here under review. Our conclusion, which we have had occasion to reconsider by granting rehearing subsequent to the filing of our original opinion herein, now finds independent support in the recent Ninth Circuit Court of Appeals decision, *Schrader* v. *Idaho Dept. of Health and Welfare* (9th Cir. 1985) 768 F.2d 1107, which was filed in the interim.

## II

The income and resources language under the federal act and regulations has often been interpreted by the courts, albeit usually in disputes as to the proper inclusion or exclusion of items from the category of "net income" rather than "resources." ■ As noted above, the AFDC program is designed primarily to provide assistance to families in which a dependent child is in need of support. To this end, the states have broad discretion in allocating AFDC funds and are free to set their own standards of need. (*Shea* v. *Vialpando* (1974) 416 U.S. 251, 253 [40 L.Ed.2d 120, 125, 94 S.Ct. 1746]; *King* v. *Smith* (1968) 392 U.S. 309, 318 [20 L.Ed.2d 1118, 1126, 88 S.Ct. 2128]; *Vaessen* v. *Woods, supra,* 35 Cal.3d 749, 755.) However, "[t]he courts have uniformly and repeatedly protected recipients from false assumptions that money the states believe should be available to meet living expenses is *in fact actually available* for such use. [Citations.]" (Italics added, *Vaessen* v. *Woods, supra,* 35 Cal.3d at p. 757; *Wood* v. *Woods* (1982) 133 Cal.App.3d 954, 958-959 [184 Cal.Rptr. 471].)

■ Because state compliance with the mandates of federal law is a condition of receiving federal grants, California, as an AFDC participant, "must therefore administer its program in compliance with the federal eligibility standards established by the [Social Security] Act, as interpreted and implemented by regulations promulgated by [the Department of Health & Human Services] HHS. [Citations.]" (*Darces* v. *Woods, supra,* 35 Cal.3d 871, 880.) ■ While a court will not superimpose its own policy judgment on that of a state administrative agency which acts in a quasi-legislative capacity, "the latitude which an administrator has in implementing a state and federal statutory scheme is not unlimited. It is well settled that a state welfare administrator may not operate welfare programs which alter, impair, or impede their statutory schemes [citations], and it is this court's obligation to strike down regulations effectuating such welfare op-

erations. [Citation.] Thus, to the extent that [a] regulation is inconsistent with controlling state and federal statutes, fundamental principles of administrative law require that it be declared invalid, and its further operation may properly be enjoined. [Citation.]" (*Garcia* v. *Swoap* (1976) 63 Cal.App.3d 903, 908-909 [134 Cal.Rptr. 137].)

Respondents argue that the fundamental and time honored policy of ensuring that states do not make assumptions of availability, and of requiring that income and resources be actually on hand or ready for use when needed (*Heckler* v. *Turner* (1985) 470 U.S. 184, — [84 L.Ed.2d 138, 149, 105 S.Ct. 1138, 1147]), is applicable to income determinations, where there is greater uncertainty as to what funds will be actually made available to the family rather than used for some other purpose, but inapplicable to resources such as realty, which are always "available" in the sense that the property itself is the resource—not the proceeds from the sale of those resources.

The attempted distinction is without substance. The federal and state provisions define both "income" and "resources" in the same words with respect to their availability. Moreover, ownership of realty as a resource is not necessarily more certain, in terms of providing for a needy child on a day-to-day basis, than is the assumption that income will find its way into the family budget. The chances of converting realty into support and maintenance are perhaps more certain in the long run, but such resources are far less certain to be available soon enough to meet current, day-to-day needs.

 Next, respondents argue that amendments to the AFDC program brought about by enactment of the Omnibus Budget Reconciliation Act of 1981 (OBRA) (Pub.L. No. 97-35, 95 Stat. 357) support their April 1982 change in policy. While OBRA did not change the income-and-resources language of section 602(a)(7)(A) (42 U.S.C.),[9] it added section 602(a)(7)(B), which marked the first time that Congress itself declared a dollar-amount limitation ($1,000) on excess resources. Prior to OBRA, the excess resources limitation ($2,000) was prescribed by regulation only. OBRA's addition of section 602(a)(7)(B) also inaugurated an express exclusion of the family home and a limited ownership interest in one automobile from the calculation of resources. (*Schrader* v. *Idaho Dept. of Health and Welfare, supra,* 768 F.2d 1107, 1109.) Both before and after OBRA, however, the federal regulation defining "currently available resource" remained unchanged: "income and resources are considered available both when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make such sum available for support and maintenance." (45 C.F.R. § 233.20(a)(3)(ii)(D).)

---

[9]All subsequent references to section 602(a) are to title 42 of the United States Code.

Respondents rely on the reasoning of the federal district courts in *Schrader* v. *Idaho Dept. of Health and Welfare* (D.Idaho 1984) 590 F.Supp. 554, and *Davis* v. *Lukhard* (E.D.Va. 1984) 591 F.Supp. 319, in which OBRA was held to support the elimination of "grace periods" during which recipients could remain eligible for AFDC assistance while making good faith efforts to liquidate real property or other resources. Respondents acknowledge that the Ninth Circuit Court of Appeals has recently overturned the district court decision in *Schrader* (*Schrader* v. *Idaho Dept. of Health and Welfare, supra,* 768 F.2d 1107), but they represent to this court that they will not consider the issue resolved until all potential for review in the United States Supreme Court has passed or HHS accedes to the Ninth Circuit's decision. They also point out that the district court decision in *Davis* is currently pending before the Fourth Circuit Court of Appeals and is as yet unresolved, thus creating the potential for conflicting federal circuit court authority pending possible United States Supreme Court resolution. Under these circumstances, we find it appropriate to undertake our own analysis of the district court decisions.

The district court in *Schrader, supra,* examined the validity of a state regulatory amendment eliminating a previously allowed grace period—an amendment reflecting the post-OBRA policy of the Secretary of HHS (Secretary) prohibiting such grace periods. (590 F.Supp. 554, 555-556.) Denying injunctive relief to class action plaintiffs, the court upheld the Secretary's regulation (45 C.F.R. § 233.20(a)(3)(ii)(D)) as consistent with OBRA and her current interpretation as consistent with the regulation. The court read the regulatory language in the disjunctive so that *two* distinct categories of resources were deemed countable toward the resource limit: (1) those which are "actually available" *or* (2) those as to which the applicant has a legal interest and the legal ability to make available. The twin categories were found to be consistent with OBRA's purpose "to bring the rapid growth of federal spending under control" (p. 558), and the Secretary's policy forbidding grace periods was found to be consistent with the "second" category of resources, those which though not "actually available," satisfy the "legal interest" and "legal ability" language (pp. 558-559). In essence, the court in *Schrader* viewed actual availability as an alternative rather than an overriding principle. The court reasoned further that the "currently available" language of the regulation was not violated in cases of hard-to-liquidate resources because "[e]ven 'hard-to-liquidate' resources may be converted to cash if offered at the right price." (P. 559.)

The federal district court in *Davis* v. *Lukhard, supra,* 591 F.Supp. 319, also upheld the amendment of a state regulation to comply with the Secretary's post-OBRA policy of disallowing grace periods. The court reached the same result as the district court in *Schrader,* although by a different

analysis.[10] Reasoning that the 97th Congress, in enacting OBRA, was presumptively aware of "the longstanding State practice of allowing AFDC households a grace period for the disposal of excess property" and that the statutory purpose of AFDC (to promote self-support and personal independence (42 U.S.C. § 601)) was unchanged by the OBRA amendments, the court concluded that Congress, by imposing a $1,000 limitation on resources and by specifically excluding only the family home and one automobile in section 602(a)(7)(B), "evidenced its intent to have every other kind of asset, regardless of its supposed liquidity, count toward determining . . . eligibility." (591 F.Supp. at pp. 325-326.) The *Davis* court also relied on *Schrader* (*id.,* at pp. 324-325) and on circuit court decisions holding that, after OBRA, mandatory deductions from salary are included in determining a wage-earning recipient's eligibility, notwithstanding the fact that such deductions are (except for possible refunds) not actually available to the recipient. (*Id.,* at pp. 326-327, citing *Bell* v. *Massinga* (4th Cir. 1983) 721 F.2d 131, 133, and *James* v. *O'Bannon* (3d Cir. 1983) 715 F.2d 794, 807; see also *Dickenson* v. *Petit* (1st Cir. 1984) 728 F.2d 23, 24.)

While we acknowledge the persuasive value usually accorded to federal district court decisions (*Central Bank* v. *Superior Court* (1973) 30 Cal.App.3d 962, 967 [106 Cal.Rptr. 912]), we respectfully disagree with the reasoning and conclusions in *Schrader* and *Davis*. The focal question in this case is whether the state may validly dispense with the element of actual availability in making excess resource determinations. The district court in *Schrader* never squarely addressed the problem since it adopted at the outset—and without discussion—the position of the Secretary of HHS that, based on a disjunctive reading of the Secretary's own regulation, actual availability and legal interest/ability are *alternative* bases for finding availability. (See also *Schrader* v. *Idaho Dept. of Health and Welfare, supra,* 768 F.2d 1107, 1113-1114 & fn. 8 [Secretary's reliance on the "liquidated sum" prong of the regulation is misguided because HEW had rejected such a construction in 1975 and because real property is, at best, a *liquidatable* resource rather than a *liquidated* sum].) The district court's further observation that any resource can be converted to cash if offered at the "right price" is no doubt true in most cases. However, as noted in the Ninth Circuit's opinion, that analysis "failed to give adequate weight to the requirement embodied in Regulation § 233.20(a)(3)(ii)(E) that resources be

---

[10]The district courts in *Schrader* and *Davis* both relied on the following comment and response, published in the Federal Register, as evidence of the Secretary's new policy: "Comment: Clarification was requested on how to proceed when an applicant or recipient has nonliquid resources such as a car or real property that could meet current need, but which must be disposed of to retain eligibility. [¶] Response: Assistance cannot be paid for any month in which the recipient has liquid or nonliquid resources which exceed the $1,000 limit prescribed by the statute." (47 Fed.Reg. 5657.)

reasonably evaluated. To say that there is some 'right price' at which any resource can be liquidated hardly establishes the 'equity value' of the resource, absent a testing of its worth on the market. Real estate in particular demands such testing before its value can be assumed." (Fn. omitted, *Schrader* v. *Idaho Dept. of Health and Welfare, supra,* 768 F.2d at p. 1113.) Furthermore, "the self-sufficiency aimed for by AFDC, *see* 42 U.S.C. § 601, would not be served by forcing families to dispose of their assets for far less than they are worth in nonpanic circumstances." (*Ibid.*) In addition, at least in California, a recipient or applicant who disposes of excess resources at below market value runs the risk of ineligibility for having transferred the property for less than "fair consideration." (Eligibility and Assistance Standards, §§ 42-22.21, 42-221.)

Next, we disagree with the *Davis* rationale that the statutory imposition of a resources limitation together with the specific exemption of a home and automobile signal a congressional intent to abandon actual availability. The resource limitation of $1,000 shows the intent to establish a uniform ceiling lower than that previously promulgated by regulation, and that is in keeping with the spending reduction goal of OBRA. However, imposition of a ceiling on available resources does not logically suggest a change in the way that those resources are determined to be available. Adding to the ceiling the exemptions for home and auto still leaves no solid basis for implying the intent found in *Davis*. The presumption that Congress acts with awareness of long established judicial or administrative interpretations, the rule of construction employed in *Davis,* actually militates against such an implication. We are confident that Congress, faced with over 40 years of consistent judicial and administrative policy, would legislate a change of this magnitude in a less subtle way than might be implied from section 602(a)(7)(B) alone. Also, the *Davis* court misplaced its reliance on decisions allowing post-OBRA treatment of mandatory payroll withholdings as countable income regardless of actual availability. As those decisions and the more recent high court decision in *Heckler* v. *Turner* (1985) 470 U.S. 184 [84 L.Ed.2d 138, 105 S.Ct. 1138], make clear, mandatory payroll withholdings escape the actual availability principle, not because of any post-OBRA demise of the principle, but because Congress has elected to now treat such sums as a work expense encompassed within the flat-sum disregard of section 602(a)(8)(A)(ii) rather than as a separate item deductible from "income" under section 602(a)(7)(A). (*Id.,* at pp. —, — [84 L.Ed.2d at pp. 146-147, 156-157, 105 S.Ct. at pp. 1144-1145, 1152-1153]; *Bell* v. *Massinga, supra,* 721 F.2d 131, 133; *James* v. *O'Bannon, supra,* 715 F.2d 794, 807.) The actual availability principle remains vital (*Heckler* v. *Turner, supra,* 470 U.S. at p. — [84 L.Ed.2d at pp. 149-150, 105 S.Ct. at pp. 1147-1148]), and the resources at issue in this case do not fall within any exemption to section 602(a)(7)(A).

Finally, it would be inappropriate in this case to defer to the interpretation of either the HHS or DSS. ■ "An agency's interpretation of its own regulations is entitled to considerable deference by the courts. [Citation.] But an agency's interpretations are not conclusive, and courts are not bound by them. [Citation.] In particular, the deference due an administrative interpretation depends upon its consistency with earlier pronouncements, [citation], the purpose and wording of other agency regulations, [citation], and the purposes of the relevant statutes. [Citation.]" (*McGoog by and through Ferguson* v. *Hegstrom* (9th Cir. 1982) 690 F.2d 1280, 1284.) The record in this case and the district court decisions in *Schrader* and *Davis,* both *supra,* show that respondents' would-be practice (stayed by the Supreme Ct. pending this review, see fn. 4, *ante*) began abruptly in 1982, in response to the OBRA amendments to AFDC, and represents a complete about-face from years of prior administrative practice based, ironically, on the same regulation (unchanged after OBRA) relied on now to justify the new policy. In these unusual circumstances, no deference is due the new interpretation.

■ In conclusion, we find no persuasive federal or state support for respondents' administrative practice of, in essence, conclusively presuming that property interests whose disposition is not legally barred are resources which are actually available to meet the family's current needs. That practice contradicts consistent and longstanding policies of the federal government and this state. The paramount goal of providing assistance to needy children and their families is hindered by a practice which denies an applicant or recipient the opportunity to demonstrate that unliquidated resources are not actually available despite diligent and good faith efforts to convert those resources and apply them to family needs. ■ Finally, Welfare and Institutions Code section 11150 expresses our state Legislature's intent that, in formulating and administering regulations with regard to property qualifications, "consideration shall be given to the ability and circumstances of the applicant or recipient in order that undue hardship is not imposed upon [them] in making plans to comply" with code provisions. (*Steilberg* v. *Lackner* (1977) 69 Cal.App.3d 780, 788 [138 Cal.Rptr. 378].)[11] Respondents' practice simply ignores hardship.

---

[11]*Miller* v. *Stumbo* (Ky.App. 1983) 661 S.W.2d 1, provides additional support for our conclusion that a real property resource must be practically as well as legally available. Sharon Miller, the AFDC recipient in that case, had her benefits discontinued when it was discovered that she owned a one-third interest (worth $1,867) in nonincome producing property valued at $5,600. Her interest exceeded the federal limit of $1,000, and she was therefore found ineligible in administrative proceedings despite the fact that the property was for sale and was difficult to sell due to numerous needed repairs. Relying on the language of the federal regulation (45 C.F.R. § 233.20(a)(3)(ii)(D)), the court of appeals reversed the trial court's affirmance of the administrative appeal board's order, finding that insufficient probative evidence supported the board's order. Concluding that the proceeds of the sale were not yet *actually available* to Miller, the court noted that she had a "legal interest" in

## III

Having concluded that the practice of respondents contravenes state and federal policy, we examine an intervening amendment to the Social Security Act occasioned by enactment of the Deficit Reduction Act of 1984 (DRA) (Pub.L. No. 98-369 (July 18, 1984) 98 Stat. 494, 1984 U.S. Code Cong. & Admin. News, p. 697). Effective October 1, 1984, states are required to exclude from the AFDC's $1,000 resource limit, "for such period or periods of time as the Secretary may prescribe, *real property which the family is making a good-faith effort to dispose of, . . .*" (Italics added, Pub.L. No. 98-369, § 2626, 98 Stat. 1136, amending 42 U.S.C. § 602(a)(7)(B).) The amendment conditions AFDC aid on eventual disposal of the property, at which time such aid is recoverable by the state as overpayment.[12] (*Ibid.*) Interim final regulations, also effective October 1, amend section 233.20(a)(3) of the Code of Federal Regulations, title 45, by requiring that states respect a family's good faith disposition efforts for a period of at least six months and, at the state's option, up to three months more. (49 Fed.Reg. 35599-35600 (Sept. 10, 1984).)[13] The amended regulation applies to both

---

the property and the "theoretical legal ability to make it available for support and maintenance," but did not have "the practical legal ability to do so. . . ." (661 S.W.2d at p. 2.) The court further concluded that Miller's interest was not in a "liquidated sum." (*Ibid.*) Although appellants herein do not pursue the "liquidated sum" element of the regulation, the *Miller* case is nevertheless significant in that the appellate court, in reversing, relied in part on the recipient's lack of "practical legal ability to make her interest in the realty available . . . ." (*Ibid.*) (See also *Parson v. Miller* (1974) 90 Nev. 126 [520 P.2d 607, 609-610] [in light of uncertain state of title and unsuccessful efforts to secure a loan against or sell an AFDC recipient's undivided 50 percent interest in real property, the resource did not appear marketable and hence a currently available resource].)

[12]As amended, section 602(a) reads in relevant part as follows (added language italicized):
"[602 (a)] A State plan for aid and services to needy families with dependent children must . . .'
"(7) except as may be otherwise provided . . ., provide that the State agency—
"... . . . . . . . . . . . . . . . . . . . . . . . . . . .
"(B) shall determine ineligible for aid any family the combined value of whose resources (reduced by any obligations or debts with respect to such resources) exceeds $1,000 or such lower amount as the State may determine, but not including as a resource for purposes of this subparagraph . . . *(iii) for such period or periods of time as the Secretary may prescribe, real property which the family is making a good-faith effort to dispose of, but any aid payable to the family for any such period shall be conditioned upon such disposal, and any payments of such aid for that period shall (at the time of the disposal) be considered overpayments to the extent that they would not have been made had the disposal occurred at the beginning of the period for which the payments of such aid were made.*"

[13]As amended, the regulation (45 C.F.R. § 233.20(a)(3)(i)(B)) provides in relevant part: "The amount of real and personal property that can be reserved for each assistance unit shall not be in excess of one thousand dollars equity value (or such lesser amount as the State specifies in its State plan) excluding only: [¶] . . . [¶] (5) Real property for a period of six months (or at the option of the State, nine months) which the family is making a good faith effort (as defined in the State plan) to sell subject to [the] following provisions. The family must sign an agreement to dispose of the property and to repay the amount of aid received during such period that would not have been paid had the property been sold at the

applicants and current recipients. (49 Fed.Reg. 35590 (Sept. 10, 1984).) By urgency legislation effective September 26, 1984, our state Legislature has codified the DRA provisions in Welfare and Institutions Code section 11257.5, adopting a six-month period of time at the end of which any real property which is unsold counts toward the eligibility ceiling of $1,000. (Stats. 1984, ch. 1447, § 6, No. 12 West's Cal. Legis. Service, p. 632, No. 7 Deering's Adv. Legis. Service, p. 903.)

These developments, in our view, make prospective relief in the form of the preliminary injunction and original writ sought here inappropriate. The federal and state schemes are now clearly expressed and implemented, they are now binding on respondents in their subsequent actions toward even "current recipients," and respondents' practice of basing eligibility on bare "legal" availability is obviously incompatible—at least in the first six months of each case. Appellants nevertheless request prospective relief, anticipating that, should their good faith efforts fail to produce a sale within the allotted six months, respondents will find them ineligible without further cooperative efforts (Welf. & Inst. Code, § 11257.5), and arguing that the principle of actual availability demands further such efforts extending into the indefinite future, notwithstanding the six- or nine-month outside limit seemingly set by the DRA amendments. We conclude that it would be premature and advisory to address this contention now, when there is no reason to believe that any of appellants will find themselves in that situation. Appellant Galster, it will be remembered, remains in this action solely as a taxpayer seeking injunctive relief, the community property interest that initially rendered her ineligible under respondents' policy being no longer a bar to benefits. We note, however, that our state Legislature has since acted to similarly remedy the very problem that she faced.[14]

---

beginning of such period, but not to exceed the amount of the net proceeds of the sale. If the property has not been sold within the specified time period, or if eligibility stops for any other reason, the entire amount of aid paid during such period will be treated as an overpayment; . . ." (49 Fed.Reg. 35599-35600.)

[14]Effective January 1, 1984, the following provision was inserted in section 11257 of California's Welfare and Institutions Code, governing retention of realty interests in cases of recent marital separation: "[I]f an applicant has entered into a marital separation for the purpose of trial or legal separation or dissolution, real property which was the usual home of the applicant shall be exempt for three months following the end of the month in which aid begins. If the recipient was receiving aid when the marital separation occurred, the period of exemption shall be three months following the end of the month in which the separation occurs. . . ." (Welf. & Inst. Code, § 11257, subd. (b)(1), as amended by Stats. 1983, ch. 902, § 2, No. 9 West's Cal. Legis. Service, pp. 4984-4985, No. 6 Deering's Adv. Legis. Service, p. 90.) Following that three-month flat exemption period, further exemption under the statute is made to depend, as to a spouse out of possession, on a species of "legal" unavailability akin to that required by respondents in this case: "To remain exempt following this three-month period, the home must be occupied by the recipient, or be unavailable for use, control, and possession due to legal proceedings affecting a property settlement or sale of the property." (*Ibid.*)

Having examined the DRA, we incidentally reject respondents' suggestion that its provisions, by setting up the good-faith-efforts amendment as an "exception" within a general rule of ineligibility (see text of amended section in fn. 12, *ante*), shows that Congress' pre-DRA intent must have been to deem nonexempt real property interests to be currently available despite practical difficulties in disposing of them.

■ Settled principles of statutory construction generally prevent deducing the intent behind one act of Congress from implications of a second act passed years later. (*Penn Mutual Co.* v. *Lederer* (1920) 252 U.S. 523, 537-538 [64 L.Ed. 698, 704-705, 40 S.Ct. 397].) Even where the later enactment specifically purports to clarify prior legislative intent—and here the DRA provision does not[15]—that expression of intent is not binding but is merely one factor for a court to consider. (*Eu* v. *Chacon* (1976) 16 Cal.3d 465, 470 [128 Cal.Rptr. 1, 546 P.2d 289]; *Bd. of Soc. Welfare* v. *County of L. A.* (1945) 27 Cal.2d 90, 97 [162 P.2d 635]; cf. *Heckler* v. *Turner, supra,* 470 U.S. 184, — [84 L.Ed.2d 138, 156-157, 105 S.Ct. 1138, 1152-1153]; *Consumer Product Safety Comm'n* v. *GTE Sylvania* (1980) 447 U.S. 102, 117-118 & fn. 13 [64 L.Ed.2d 766, 777-778, 100 S.Ct. 2051].) As an illustration of why that rule of construction exists, this case demonstrates that such deductions are frequently two-sided and hence inconclusive. Respondents view the good-faith-efforts amendment as Congress' first departure from a priorly inflexible rule of presuming current availability; but appellants view the amendment as Congress' first constraint (i.e., by time limits and conditioned benefits) on a longstanding policy of looking to actual

---

[15]The only express indication of intent is this brief explanation of the amendment's legislative history:

"*Present law* [¶] . . . Real property is considered as a resource available to the family both when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make the sum available for support and maintenance.

"*House bill* [¶] Exempt from the AFDC resource limitation, . . . real property which the household is making a good faith effort to sell at a reasonable price and which has not been sold. Effective October 1, 1984.

"*Senate amendment* [¶] No provision.

"*Conference agreement* [¶] The conference agreement follows the House bill with a modification establishing an AFDC policy on real property that is similar to SSI policy. The managers intend that by regulation, real property which the household is making a good faith effort to sell would be exempt for six months (with State option for an additional 3 months) but only if the family agrees to use the proceeds from the sale to repay the AFDC paid. Any remaining proceeds would be considered a resource." (Pub.L. No. 98-369, House Conf. Report No. 98-861, pp. 1395-1396, 1984 U.S. Code Cong. & Admin. News, pp. 2083-2084.)

As can be seen, the explanation does no more than restate preexisting law as worded in the Code of Federal Regulations, title 45, section 233.20(a)(3)(ii)(B), and indicate that the time periods, etc., are meant to conform to Social Security provisions.

or practical availability. Absent a stronger indication of congressional intent, we decline to draw an inference either way. (Accord *Schrader* v. *Idaho Dept. of Health and Welfare, supra,* 768 F.2d 1107, 1114-1115.)

DISPOSITION

Although prospective relief is no longer appropriate, three of appellants additionally sought administrative mandamus relief against respondents' final administrative rulings denying each of them benefits despite good faith efforts to dispose of their real property interests. They are entitled to that relief.

As to the appeal (A021109), the judgment is affirmed insofar as it denies injunctive relief but reversed and remanded insofar as it impliedly denies administrative mandamus relief.[16] The superior court is directed to grant administrative mandamus to appellants Kronsperger-Smith, Williams and Burros, and to remand the matter for further administrative proceedings consistent with this opinion.

Because appellants, by virtue of their appeal and the interim stay granted by the Supreme Court, have an adequate remedy at law, the original petition for writ of mandamus filed in this court (A020975) must be and is denied. (Code Civ. Proc., § 1086.) In order to ensure simultaneous finality of both

---

[16]In an admitted effort to transform her taxpayer action into a species of "class action," appellant Galster seeks declaratory and injunctive relief to compel DSS to seek out and make remedial payments to those applicants who, during the one-year period in which its invalid policy was in effect (i.e., the year preceding the Supreme Court's stay [see fn. 4, *ante*]), were improperly denied assistance under that policy.

Whatever the propriety of such relief in taxpayer actions generally, a point hotly disputed by the parties, we find no need for it in this case. The Ninth Circuit's decision in *Schrader,* a case to which the federal agency (HHS) is a party, offers clear "declaratory relief" concerning the federal agency and, a fortiori, state agencies that must comply with the mandates of federal law. Also, as appellants themselves note, California is required by federal regulation to prompt correct AFDC underpayments, apparently without time limits for making retroactive correction. (45 C.F.R. § 233.20(a)(13)(ii); cf. *id.,* § 233.20(a)(12)(ii)(a) [in programs *other than* AFDC, retroactive correction of underpayments limited to the 12 months preceding discovery of underpayment].) Respondents represent, further, that they intend to abide by that requirement. In summary, we have no reason to believe that DSS will not accede to our decision, and there is accordingly no need for the requested coercive remedy. (*Assembly* v. *Deukmejian* (1982) 30 Cal.3d 638, 679 [180 Cal.Rptr. 297, 639 P.2d 939], app. dism. and cert. den., 456 U.S. 941 [72 L.Ed.2d 463, 102 S.Ct. 2003]; *Legislature* v. *Reinecke* (1973) 10 Cal.3d 396, 407 [110 Cal.Rptr. 718, 516 P.2d 6].)

dispositions herein (see Cal. Rules of Court, rule 24(a)), the petition is hereby denied effective 30 days after the filing of this opinion.[17]

Kline, P. J., and Rouse, J., concurred.

---

[17]Although the Supreme Court granted appellants' petition for a hearing for purposes of issuing the stay and retransferring the cause to this court, no alternative writ ever issued. (See Cal. Rules of Court, rule 24(a).)