768 F.2d 1107
 Debbie SCHRADER, individually and on Behalf of all those
similarly situated, Plaintiffs-Appellants,
v.
IDAHO DEPARTMENT OF HEALTH AND WELFARE; and Margaret
Heckler, in her official capacity as Secretary of
the United States Department of Health
and Human Services,
Defendants-Appellees.
 No. 84-4079.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 4, 1985.
Decided Aug. 15, 1985.
 
 Alan Wasserman, Marc McGregor, Idaho Legal Aid Service, Inc., Coeur d'Alene, Idaho, for plaintiffs-appellants.
 Jancie L. Kroeger, Deputy Atty. Gen., Coeur d'Alene, Idaho, Jeffery W. Ring, Asst. U.S. Atty., Boise, Idaho, Patrick E. McBride, Seattle, Wash., for defendants-appellees.
 Appeal from the United States District Court for the District of Idaho.
 Before CHOY, ANDERSON and TANG, Circuit Judges.
 CHOY, Senior Circuit Judge:
 
 
 1
 The issue on appeal is whether officials administering the Aid to Families with Dependent Children (AFDC) program in determining eligibility for aid, may count an applicant's or recipient's real property interest as "available" regardless of whether it was actually available to meet his or her family's current needs.
 
 
 2
 Debbie Schrader, acting individually and on behalf of all those similarly situated, appeals from the district court's decision granting summary judgment for the officials administering the program. Schrader alleges that a regulation of the Idaho Department of Health and Welfare (IDHW) conflicts with the Social Security Act. We agree, and reverse.
 
 I. BACKGROUND
 A. Posture
 
 3
 Schrader brought this class action to attack a state regulation that required all of a family's assets to be counted towards the statutory $1,000 resource limit for AFDC eligibility, without excepting assets that were difficult to sell and that may not have been actually available to meet the family's needs. The IDHW had adopted this regulation at the direction of the United States Department of Health and Human Services (HHS).[1]
 
 
 4
 The district court issued a preliminary injunction to prevent the IDHW from implementing its revised, no-grace-period regulation. The court later issued an opinion and order granting summary judgment for the defendants. 590 F.Supp. 554 (D.Idaho 1984). As part of its final order, the court stayed the order and extended its preliminary injunction pending the outcome of this appeal. 590 F.Supp. at 561.B. Facts
 
 
 5
 The class represented by Schrader consists of families in Idaho whose AFDC was terminated or whose applications for aid were denied solely because they owned hard-to-liquidate, real property assets valued at more than the $1,000 statutory limit. Often the asset in question was an isolated parcel of unimproved land.
 
 
 6
 For example, Fran Lawson and her three-year-old child lived in a trailer owned by Lawson in California. When Lawson's ex-husband, who had been implicated in the death of another of his prior wives, began threatening Lawson and her daughter, they moved to Idaho. Even though Lawson owned the trailer and the land upon which it was located, IDHW granted aid to Lawson because of her reasonable, good-faith efforts to sell the land and trailer. IDHW terminated her aid later, when HHS threatened to cut off federal funds to IDHW unless the state program renounced its policy of allowing a grace period for the good-faith disposition of hard-to-liquidate resources. IDHW did not determine whether Lawson could liquidate her California assets.
 
 
 7
 Monica Harper and her two young children lived in a house in California jointly owned by Harper and her husband. When Harper's husband beat her and told her to leave, she and the children moved to Idaho. IDHW refused to grant aid to Harper because of her one-half interest in the home. IDHW did not determine whether Harper's interest was actually available to her.
 
 
 8
 C. Changes in the AFDC Statute: OBRA and DRA
 
 
 9
 The AFDC program authorized under Title IV-A of the Social Security Act, 42 U.S.C. Sec. 601 et seq., is a coordinated federal-state effort established by Congress to enable each state to assist needy, dependent children and the parent or other caretaker relative with whom they live. To determine a family's eligibility, the state agency administering the AFDC program compares the family's income to a standard of need set by the state, and also measures the family's resources against a national limit.
 
 
 10
 Prior to 1981, the resource limit was $2,000, as prescribed by regulation. In 1981, Congress enacted the Omnibus Budget Reconciliation Act, Pub.L. No. 97-35, Secs. 2305, 2320(b)(1), 95 Stat. 844, which halved the amount of resources of an eligible family to $1,000.
 
 
 11
 The AFDC statute has never explicitly defined the term "resources." HHS, however, had consistently issued regulations such as that appearing at 45 C.F.R. Sec. 233.20(a)(3) (1980), which wholly excluded from countable resources a family's personal effects, automobile, and income-producing property.
 
 
 12
 In OBRA, Congress for the first time codified some of these exclusions and set a statutory limit on nonexcluded resources. The OBRA amendment required a state qualifying for federal financial participation in its AFDC program to:
 
 
 13
 determine ineligible for aid any family the combined value of whose resources (reduced by any obligations or debts with respect to such resources) exceeds $1,000 or such lower amount as the State may determine, but not including as a resource for purposes of this subparagraph a home owned and occupied by such child, relative, or other individual....
 
 
 14
 42 U.S.C. Sec. 602(a)(7)(B) (1981) (emphasis added).
 
 
 15
 Congress later enacted the Deficit Reduction Act of 1984, P.L. 98-369, 98 Stat. 494 (DRA). In DRA, Congress permitted the exclusion from countable resources:
 
 
 16
 for such period or periods of time as the Secretary may prescribe, real property which the family is making a good faith effort to dispose of, but any aid payable to the family for any such period shall be conditioned upon such disposal, and any payments of such aid for that period shall (at the time of the disposal), be considered overpayments to the extent that they would not have been made had the disposal occurred at the beginning of the period for which the payments of such aid were made.
 
 
 17
 42 U.S.C. Sec. 602(a)(7)(B)(iii) (effective October 1, 1984) (emphasis added). The DRA thus codified a conditional, limited variant of the grace period provision that the Secretary argues OBRA barred three years earlier.
 
 II. DISCUSSION
 A. Standard of Review
 
 18
 Faced with no disputed issues of fact, the district court granted summary judgment on a pure question of law. This court reviews a grant of summary judgment de novo. National Union Fire Insurance Co. v. Argonaut Insurance Co., 701 F.2d 95, 96 (9th Cir.1983).
 
 B. Analysis
 1. The Availability Principle and OBRA
 
 19
 The principle of actual availability has been long established in AFDC law. As early as 1940, a Social Security Board policy statement provided that Sec. 602(a)(7)(A) income and resources must be valued at the amount actually produced, and not at an inflated, imputed amount. The statement also provided that resources are available only if they are actually on hand or ready for use when needed. See Heckler v. Turner, --- U.S. ----, 105 S.Ct. 1138, 1147, 84 L.Ed.2d 138 (1985).
 
 
 20
 a. Efficiency and Incentive
 
 
 21
 The Secretary argues that her policy results in administrative efficiency and discourages potential AFDC families from sheltering resources in hard-to-liquidate assets. Such arguments are to be rejected if they are grounded in legal fiction rather than fact. For example, in Shea v. Vialpando, 416 U.S. 251, 94 S.Ct. 1746, 40 L.Ed.2d 120 (1974), the Court struck down a Colorado regulation that limited work-related expenses to $30 per month, even if the applicant could demonstrate higher expenditures. The Court said, "the determination of need in each case is to be based upon an assessment of the particular individual's available income and resources. Moreover, individualized consideration is clearly contemplated by HEW regulations ... [including] 45 C.F.R. Secs. 233.20(a)(3)(ii-vii)...." 416 U.S. at 261-62, 94 S.Ct. at 1754-55.
 
 
 22
 In National Welfare Rights Organization v. Mathews, 533 F.2d 637, 647-49 (D.C.Cir.1976), the court held that measuring the availability of resources at their market value without regard to encumbrances violated the federal statute and HEW's regulations. The court rejected an HEW argument similar to the Secretary's argument here that a grace period encourages families to tie up assets in hard-to-liquidate form. 533 F.2d at 646-47 n. 15. Because we find that HHS's policy does not comport with reality, see infra, we reject the Secretary's efficiency and incentive argument.
 
 
 23
 b. Repeal
 
 
 24
 The Secretary acknowledges that prior to the enactment of OBRA, federal regulations permitted states to allow a grace period for the disposition of nonliquid assets, and that twenty-one states allowed grace periods prior to her change in policy. The Secretary does not claim that Congress's acquiescence in grace periods before 1981 was reflected in the language of the AFDC statute, nor does she cite any federal regulations permitting grace periods prior to 1981.
 
 
 25
 The Secretary admits that 45 C.F.R. Secs. 233.20(a)(3)(ii)(D) and (E), the regulations concerning, respectively, the availability of resources and their reasonable evaluation, "were unchanged in pertinent part by OBRA." The Secretary argues, however, that Congress in OBRA repealed grace periods sub silentio.[2]
 
 
 26
 Although no federal appellate court has considered OBRA's effect on grace periods,[3] the Supreme Court has concluded that in OBRA, Congress implicitly affirmed the availability principle. See Heckler v. Turner, 105 S.Ct. at 1147.
 
 
 27
 c. Deference
 
 
 28
 The Secretary argues that an agency's interpretation of its own regulations deserves deference. She cites HHS's preamble and comments to the final regulations implementing OBRA as evidence that the 1981 statute had prohibited grace periods:
 
 
 29
 Comment: Clarification was requested on how to proceed when an applicant or recipient has non-liquid resources such as a car or real property that could meet current need, but which must be disposed of to retain eligibility.
 
 
 30
 Response: Assistance cannot be paid for any month in which the recipient has liquid or non-liquid resources which exceed the $1,000 limit prescribed by the statute.
 
 
 31
 47 Fed.Reg. 5,657 (February 5, 1982) (emphasis added).
 
 The speaker also states, however,:
 
 32
 Comment: One of the comments asked for a definition of "currently available" when applied to evaluating resources.
 
 
 33
 Response: The existing regulation at Sec. 233.20(a)(3)(ii)(D) gives a clear statement of what "currently available" means, and is unchanged by the new statute.
 
 
 34
 47 Fed.Reg. 5,657 (February 5, 1982) (emphasis added).
 
 
 35
 In defining "currently available," the second colloquy refers the reader to the regulation one would expect to be changed if OBRA had indeed prohibited grace periods. In contrast, the first colloquy assumes its conclusion when it asks about "resources ... that could meet current need."[4]
 
 
 36
 We are not persuaded that HHS's purported 1983 about-face position on grace periods has sufficient support in the language or legislative history of the 1981 OBRA amendments. The official interpretation embodied in the unchanged language of 45 C.F.R. Secs. 233.20(a)(3)(ii)(D) and (E) deserves more weight than the Secretary's informal policy purporting to apply the OBRA changes to the regulations.
 
 
 37
 See Townsend v. Swank, 404 U.S. 282, 286, 92 S.Ct. 502, 505, 30 L.Ed.2d 448 (1971) (Department of Health, Education, and Welfare (HEW) regulations that implied that states could vary eligibility requirements from the AFDC statute were invalid); McCoog v. Hegstrom, 690 F.2d 1280, 1284 (9th Cir.1982) (HEW regulations that were inconsistent with its earlier pronouncements, the purpose and wording of other agency regulations, and the purposes of the relevant statutes were invalid); compare C. Sands, 2A Statutes and Statutory Construction (formally Sutherland on Statutory Construction ) Sec. 49.05 and cases cited therein (N. Singer 4th ed. 1984) with id. at Sec. 49.06 and cases cited therein.
 
 
 38
 After considering the Secretary's arguments on efficiency and incentive, implicit repeal, and deference, we are nonetheless persuaded that Congress in 1981 did not intend to renounce the availability principle as applied to resources.
 
 
 39
 2. The Availability Principle and the Idaho Regulation
 
 
 40
 The issue presented in this case is not whether the resource availability requirement of the Social Security Act compels grace periods. The issue is whether the revised Idaho regulation which, inter alia, bars grace periods satisfies the availability requirement. We conclude that it does not.
 
 
 41
 Long before OBRA, the Secretary had promulgated a regulation that defined the term "resource" as used in the AFDC statute. At the time of OBRA's passage, that regulation provided:
 
 
 42
 Net income available for current use and currently available resources shall be considered; income and resources are considered available both when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make such sum available for support and maintenance....
 
 
 43
 45 C.F.R. Sec. 233.20(a)(3)(ii)(D) (1980). Significantly, Regulation Sec. 233.20(a)(3)(ii)(D), the only officially promulgated regulation directly concerned with the availability of resources, did not change as a result of OBRA.[5]
 
 
 44
 Regulation Sec. 233.20(a)(3)(ii)(D) was promulgated in response to the requirement of 42 U.S.C. Sec. 602(a)(7)(A) that states "take into consideration any other income and resources of any child or relative claiming aid to families with dependent children." A specification of what resources will not be counted, however, must be considered first. Prior to 1981, the specifications were listed in regulations such as 45 C.F.R. Sec. 233.20(a)(3) (1980), but with OBRA it became largely a part of the statute. The next administrative task is to decide whether the asset is sufficiently available to the family to reduce its need as a matter of fact, not legal fiction. See 45 C.F.R. Sec. 233.20(a)(3)(ii)(D). The final concommitant of the availability principle is that resources be reasonably evaluated. For example, administrators may not value an item at its full fair market value if the item is encumbered. See 45 C.F.R. Sec. 233.20(a)(3)(ii)(E).[6]
 
 
 45
 The combined requirements of 45 C.F.R. Secs. 233.20(a)(3)(ii)(D) and (E) make it difficult to see how a resource can be considered available, and worth more than the $1,000 limit, when the fair market value of the property has never been established by buyers willing to pay a given price for it. Indeed, Schrader argues that for IDHW to "reasonably evaluate" real property it must view the property in the context of the local real estate market. Absent an opportunity to see whether buyers exist for the property at a given price, Schrader argues, the requirements of 45 C.F.R. Secs. 233.20(a)(3)(ii)(D) and (E) are not met.
 
 
 46
 The district court disposed of this issue in a curious way. It began by noting Turner v. Prod, 707 F.2d 1109 (9th Cir.1983), reversed on other grounds sub nom., Heckler v. Turner, --- U.S. ----, 105 S.Ct. 1138, 84 L.Ed.2d 138 (1985), in which this court construed an analagous provision, 42 U.S.C. Sec. 602(a)(8), as prohibiting the Secretary from counting mandatory payroll tax withholdings as "income" for eligibility purposes. After declaring that it is more difficult to determine the current availability of resources than of income, the court wrote:
 
 
 47
 It cannot be disputed that some resources are more easily sold and converted to cash than others. To this extent, some types of resources are more currently available than other types of resources. However, it is also generally true that all resources have a price at which they may be liquidated. Even "hard-to-liquidate" resources may be converted to cash if offered at the right price. In this sense, hard-to-liquidate resources are resources which could be currently available to an applicant. Hard-to liquidate resources must be distinguished from resources in [sic] which the applicant has no legal ability to convert to cash. Certainly, if the applicant has no legal right to the resource, the resource cannot be considered currently available to meet the applicant's needs....
 
 
 48
 ....
 
 
 49
 ... [T]o the extent that the Secretary's current interpretation of her regulations prohibits the exclusion of resources which the applicant has a legal ability to sell, such interpretation does not exceed the Secretary's authority....
 
 
 50
 590 F.Supp. at 559-60 (emphasis added).
 
 
 51
 The district court's analysis was unsound in two related respects. First, it failed to give adequate weight to the requirement embodied in Regulation Sec. 233.20(a)(3)(ii)(E) that resources be reasonably evaluated. To say that there is some "right price" at which any resource can be liquidated hardly establishes the "equity value" of the resource, absent a testing of its worth on the market. Real estate in particular demands such testing before its value can be assumed.[7]
 
 
 52
 Even if Schrader had received offers of $1,000 or more for her assets, she argues that in enacting OBRA, Congress never intended to force her to immediately liquidate those assets at a fire-sale price. We agree. Although she does not argue that HHS may not require her to take action to make her resources available to meet her current needs, the self-sufficiency aimed for by AFDC, see 42 U.S.C. Sec. 601, would not be served by forcing families to dispose of their assets for far less than they are worth in non-panic circumstances.
 
 
 53
 The district court's second, related error was to misread Regulation Sec. 233.20(a)(3)(ii)(D). Its opinion consistently refers to an applicant's "legal right" to a resource or her "legal ability" to sell it. Yet HEW rejected such a construction of availability in 1975, preferring a definition that focused on the actual, not legal, availability of resources.[8] Any reliance by the Secretary on the "liquidated sum" prong of the definition of availability in Regulation Sec. 233.20(a)(3)(ii)(D) is therefore misguided.
 
 3. The DRA
 
 54
 The Secretary argues that the DRA, by codifying grace periods as an exception within a general rule of ineligibility, showed that Congress's pre-DRA intent must have been to deem nonexcluded real property interests to be currently available despite practical difficulties in disposing of them. Even if the DRA purported to clarify the intent of the OBRA Congress, which it does not[9], that expression of intent would not be conclusive.
 
 
 55
 It is well settled that the views of a later Congress regarding the legislative intent of a previous Congress do not deserve much weight. Consumer Product Safety Comm'n v. GTE Sylvania, 447 U.S. 102, 117, 100 S.Ct. 2051, 2060, 64 L.Ed.2d 766 (1980). Courts avoid deducing the intent behind one act of Congress from the implication of a second act passed years later. Cf. Penn Mutual Co. v. Lederer, 252 U.S. 523, 537-38, 40 S.Ct. 397, 402, 64 L.Ed.698 (1920).
 
 
 56
 The legislative reports cited by the Secretary can be read to imply that existing law under OBRA did not recognize grace periods. They can be read equally plausibly to indicate that the committees aimed to coordinate the AFDC program's grace periods policy, whatever it was, with the policy of the food stamp and SSI programs. The court in Galster v. Woods, faced with the same issue as posed here, put the point well:
 
 
 57
 [A]s an illustration of why that rule of statutory construction [cited in the previous paragraph] exists, this case demonstrates that such deductions are frequently two-sided and hence inconclusive. Respondents view the good-faith-efforts amendment as Congress' first departure from a priorly inflexible rule of presuming current availability; but [prevailing] appellants will view the amendment as Congress' first constraint (i.e., by time limits and conditioned benefits) on a long standing policy of looking to actual or practical availability.
 
 
 58
 161 Cal.App.3d at 101, 207 Cal.Rptr. at 413.
 
 
 59
 The legislative history relied upon by the Secretary is too ambiguous to support the Secretary's insistence that "[i]f the law prior to enactment of Sec. 2626 [of DRA] provided for a grace period, then the enactment of Sec. 2626 was a senseless act." In fact Sec. 2626 would be a sensible enactment if prior law had allowed unlimited grace periods. Reining in the availability principle by conditioning aid on eventual disposal of excess property, and making the aid paid during such a grace period recoverable as an overpayment, would be a very sensible thing for a "Deficit Reduction" Act to do.
 
 III. CONCLUSION
 
 60
 For the foregoing reasons we reverse the decision of the district court and remand for proceedings in conformity with this opinion. We caution that our holding is not to enable class members to malinger in disposing of excess resources. Indeed, we have assumed that they did not malinger.
 
 
 61
 Schrader does not argue that HHS may not require her to take any action to make her resources available to meet her current needs. She does argue, and we agree, that in lowering the previous $2,000 resource limit to $1,000 in OBRA, Congress never intended to force liquidation of excess resources at fire-sale prices.
 
 
 62
 We reverse the decision below because, inter alia, it permitted Idaho to deny AFDC benefits to applicants who owned assets whose "book value" exceeded $1,000 and who were attempting in good faith to sell the assets but had not yet been successful. Even if we accepted the district court's "right price" fire-sale analysis, the record before us does not show that the class members received and rejected offers of more than $1,000 for their nonexcluded resources. Absent such proof, any assumption by administrators that a parcel of property currently reduced its owner family's need by more than $1,000 was at least in part unverified, and violated the Social Security Act and its requirement of demonstrable availability set forth in 45 C.F.R. Secs. 233.20(a)(3)(ii)(D) and (E).
 
 
 63
 The district court on remand will consider the effect of the DRA amendments effective October 1, 1984 on the relief sought by Schrader. While nothing in this opinion suggests that the requirements of the Social Security Act can be satisfied only by the exact provisions of the pre-November 1, 1983 Idaho regulation, our holding that the revised regulation violated the Act makes the district court's task a simple one so long as the case remains proper for summary disposition.
 
 REVERSED and REMANDED.[10]
 
 
 [1]
 Prior to November 1, 1983, Idaho law sanctioned a grace period for the disposition of illiquid resources. The applicable regulation read:
 Excess Resource Exception. Excess nonexcluded resources owned or possessed by an A/R must not be counted toward the resource limits in Manual Section 3-1345 if the A/R did not conceal the resource and at least one (1) of the following conditions applies:
 (a) The resource is not immediately convertible into cash and a reasonable time is needed to convert it to cash; or
 (b) The A/R is not the sole owner and:
 (1) The other owners are unwilling to sell the resource and divide the proceeds; or
 (2) The value of the interest owned by the A/R is insufficient to justify the expense of making the resource available; or
 (3) The interest is not saleable; or
 (c) The A/R is incompetent and:
 (1) Either there is no legal guardian; or
 (2) The value of the resource is insufficient to justify the expense of making the resource available; or
 (d) The A/R has expressed an interest in disposing of the excess resource and is making a reasonable effort to dispose of the resource by offering it for sale for at least ninety per cent (90%) of current market value in an area where it could command a market and:
 (1) No buyer has been found; and
 (2) It appears that the resource is not readily saleable.
 (e) The Field Office must advise an A/R with excess resources of the conditions for excluding excess resources.
 Following a November 1, 1983 emergency rulemaking, the regulation read:
 Excess Resource Exception. Excess nonexcluded resources owned or possessed by an A/R must not be counted toward the resource limits in Manual Section 3-1345 if the A/R did not conceal the resource and at least one (1) of the following conditions applies:
 (a) The A/R is not the sole owner and:
 (1) The other owners are unwilling to sell the resource and divide the proceeds; or
 (2) The value of the interest owned by the A/R is insufficient to justify the expense of making the resource available; or
 (3) The interest is not saleable; or
 (b) The A/R is incompetent and:
 (1) Either there is no legal guardian; or
 (2) The value of the resource is insufficient to justify the expense of making the resource available.
 Idaho Department of Health and Welfare Manual, Title 3, ch. 1, "Rules and Regulations Governing Eligibility for Financial and Medical Assistance," Sec. 3-1355.01. It is the application of the above revised regulation that plaintiffs-appellants seek to enjoin.
 
 
 [2]
 Claims of repeal by implication are viewed with skepticism. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 382 n. 66, 102 S.Ct. 1825, 1841 n. 66, 72 L.Ed.2d 182 (1982); cf. Schweiker v. Gray Panthers, 453 U.S. 34, 46, 101 S.Ct. 2633, 2641, 69 L.Ed.2d 460 (1981) (finding that Congress implicitly ratified a common state practice concerning medicaid plans)
 
 
 [3]
 We are also aware of one appellate decision in the state courts that takes a position almost identical with our holding today. See Galster v. Woods, 161 Cal.App.3d 85, 207 Cal.Rptr. 402 (1984), rehearing granted, November 21, 1984, argued June 12, 1985. Accord Miller v. Stumbo, 661 S.W.2d 1 (Ky.Ct.App.1983)
 
 
 [4]
 Cf. Galster v. Woods, 161 Cal.App.3d at 97 n. 9, 207 Cal.Rptr. at 410 n. 9 ("We note that the response would assume the comment's given fact of availability--i.e., that the property 'could meet current need....' ")
 
 
 [5]
 Also instructive is the long prior history of this regulation. A 1973 proposal by HHS's predecessor, HEW, would have focused on the applicant's "legal ability" instead of her actual, practical ability to make a resource available: "income and resources are considered available both when actually available and when the applicant or recipient has a legal interest therein and has the legal ability to make them available but does not do so...." 38 Fed.Reg. 18,254 (July 9, 1973). But after receiving comments and reconsidering the above proposal, the HEW published a final revised rule which is essentially the same HHS regulation that has been in effect to this day: "income and resources are considered available both when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make such sum available for support and maintenance." 40 Fed.Reg. 12,508 (March 19, 1975). Four months later HEW published the following comment explaining the final rule:
 [Comment:] Changes in the definitions of "currently available" income and resources are contrary to federal court decisions affirmed by the U.S. Supreme Court and are unnecessarily punitive and open to subjective interpretation.
 Response: The comments raised a valid criticism with respect to the interpretation of the phrase "currently available." The language of the regulation was clarified so that the reference regarding consideration of a legal interest in income or resources is a reference to a liquidated sum and not to an uncollected judgment such as a child support order which has not been paid. The regulations were revised to recognize the distinction which exists between that which is actually available and those resources which exist only in the form of unliquidated legal causes of action.
 
 
 [40]
 Fed.Reg. 30,964 (July 24, 1975)
 The regulation arrived at by HEW in 1975 continued to embody the requirement of actual availability. As noted, 45 C.F.R. Sec. 233.20(a)(3)(ii)(D), the almost identical successor of that regulation, survived OBRA unchanged.
 
 
 [6]
 45 C.F.R. Sec. 233.20(a)(3)(ii)(E) states:
 Income and resources will be reasonably evaluated. Resources will be evaluated according to their equity value.
 ... Equity value means fair market value minus encumbrances (legal debts); Fair market value means the price an item of a particular make, model, size, material or condition will sell for on the open market in the geographic area involved....
 
 
 [7]
 The Secretary maintains that Schrader does not contest that the disqualifying properties are worth more than $1,000 each. Even if we accept this as true, it is not enough to affirm the district court's decision. For that it would be necessary that the "right price" referred to in the quoted portion of the district court's opinion was in each instance over $1,000. We see no way for this to be established without inquiry into the market response to each of the properties. Again, the question is not some theoretical "What is this resource worth?" but, very practically, "How much of the value of this resource is currently available to the applicant?"
 
 
 [8]
 We note parenthetically that the difference between an applicant's legal interest in a resource and her legal interest in the cash or cash equivalent resulting from its sale is clear. Regulation Sec. 233.20(a)(3)(ii)(E) provides that "Liquid assets are those properties in the form of cash or other financial instruments which are convertible to cash and include savings accounts, checking accounts, stocks, bonds, mutual fund shares, promissory notes, mortgages, loan value of insurance policies, and similar properties...." This definition makes plain the difference between the "liquidated sum" referred to in the availability definition of Sec. 233.20(a)(3)(ii)(D), and real property assets which are, at best, liquidatable
 
 
 [9]
 The chief express indication of intent is this brief explanation of the amendment's legislative history:
 "Present law ... Real property is considered as a resource available to the family both when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make the sum available for support and maintenance.
 "House bill Exempt from the AFDC resource limitation, ... real property which the household is making a good faith effort to sell at a reasonable price and which has not been sold. Effective October 1, 1984.
 "Senate amendment No provision.
 "Conference agreement The conference agreement follows the House bill with a modification establishing an AFDC policy on real property that is similar to SSI policy. The managers intend that by regulation, real property which the family is making a good faith effort to sell would be exempt for six months (with State option for an additional 3 months) but only if the family agrees to use the proceeds from the sale to repay the AFDC paid. Any remaining proceeds would be considered a resource." Pub.L. No. 98-369, House Conf.Report No. 98-861, pp. 1395-1396, 1984 U.S.Code Cong. & Ad.News 697, 2083-2084.
 The Secretary also cites H.R.Rep. No. 98-664, 98th Cong., 2d Sess. 16 (1984):
 "[R]esources in the form of real property which the family is making a good faith effort to sell at a reasonable price would not be counted as a resource as is now the case under the food stamp program. It is the intent of this committee that in developing such regulations, the Secretary shall conform them as much as possible to the rules for the food stamp and/or SSI programs so as to coordinate the eligibility requirements under these programs."
 
 
 [10]
 Upon remand, appellants may move in the district court for an award of reasonable attorney's fees, including the services rendered on this appeal, under 42 U.S.C. Sec. 1988 and 28 U.S.C. Sec. 2412(d)(1)(A). We express no view upon whether or not attorney's fees should be allowed in these proceedings. That is a matter for the district court to determine initially