**Melba HENRY, individually, and on behalf of all others similarly situated, Plaintiff-Appellee Cross-Appellant,**

v.

**George GROSS, as Commissioner of the New York City Human Resources Administration, and Martin Burdick, individually, and as Deputy Administrator of the New York City Human Resources Administration, Defendants-Appellants Cross-Appellees.**

**Nos. 405, 510, Dockets 85–7591, 85–7649.**

United States Court of Appeals, Second Circuit.

Argued Nov. 13, 1985.

Decided Oct. 14, 1986.

Cecilia Tso, New York City (Frederick A.O. Schwarz, Jr., of counsel), for defendants-appellants cross-appellees.

Stephen Loffredo, The Legal Aid Society, Bronx, N.Y. (Helen Hershkoff and Nancy Morawetz, New York City, of counsel), for plaintiff-appellee cross-appellant.

Before TIMBERS, KEARSE and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

In this action plaintiff, appearing individually and on behalf of others similarly situated, challenges the legality of the practices of the City of New York in its efforts to terminate the public assistance ("PA") benefits of PA recipients who have bank accounts with balances in excess of $1,000, which render their owners ineligible for PA benefits. Briefly stated, the challenged program (the "bank match" program) consists of matching the city's computerized list of PA recipients with computer tapes of several different banks to discover the name of a PA recipient which appears on any bank account with a balance that exceeds $1,000. On the basis of the information provided—the details of which vary depending upon the bank involved—the city commences its procedure to terminate the recipient's PA benefits. Plaintiff argues (1) that the city begins the termination process on the basis of inadequate information and (2) that the form used to notify the PA recipient of the impending termination is unlawful because it does not provide information sufficient to allow the recipient to prepare a defense and halt the termination process. Plaintiff concludes that the bank match program not only violates state and federal regulations governing the circumstances under which public assistance may be reduced or terminated, but also infringes the constitutional due process rights of PA recipients.

In defense of its bank match program the city contends that the information triggering its termination procedures is adequate and that the notices in use, both previously and currently, comport with the requirements of all applicable regulations as well as due process. As appellant, the city argues that the requirements placed on the city by the judgment of the district court create an administrative burden for the city that is not justified by the possibility of an erroneous deprivation.

We conclude that the judgment of the court below properly requires the city to adhere to state and federal regulations; it also strikes a proper balance between the rights of PA recipients and the administrative burden placed on the city. Accordingly, we affirm.

## BACKGROUND

### A. The Bank Match Program.

1. *The circumstances under which benefits are terminated and the PA recipient's right to appeal.*

Under federal law and applicable state and federal regulations a person who has access to a bank account with a balance in excess of $1,000 is ineligible for public assistance. *See* 42 U.S.C. § 602(a)(7)(B) (federal statute); 45 C.F.R. § 233.20(a)(3)(i)(B) (federal regulation); 18 N.Y.C.R.R. § 352.-23(b) (New York State regulation). Although PA recipients are required to disclose the value of all assets, including bank accounts, *see* 18 N.Y.C.R.R. § 351.-1(b)(2)(ii)(f), the city asserts that it learned of many individuals who were wrongfully receiving PA, because they had concealed the existence of disqualifying bank accounts. It was to deal with what the city

has described as this "particularly frustrating" situation that the city instituted the bank match program.

Banks participating in the program are sent a computer tape containing the names, addresses, social security numbers, and dates of birth of PA recipients. Through their own computers the banks compare the names provided by the city with the names listed on their bank accounts. Each participating bank then sends to the city a list of PA recipients whose names are also listed on its bank accounts. Although the specific information provided varies from bank to bank, each one provides, at a minimum, the balance in the account bearing the name of each listed PA recipient. Some banks also report whether the account at issue is owned jointly or individually.

As soon as the city learns the name of a PA recipient on an account having a balance that exceeds $1,000, and before attempting to discuss the situation with the PA recipient, the city begins its procedure to terminate the recipient's PA benefits by having its own computer print out a notice of intent to terminate benefits (the "notice of intent"). Typically, the notice of intent is sent out approximately sixteen days prior to the actual termination of benefits. The content of this notice was changed during the course of this litigation and will be described in greater detail below.

A person receiving a notice of intent has the right to request a conference with a "liaison and adjustment" ("L & A") worker at a neighborhood income maintenance center. This L & A worker is not the caseworker who handles the individual's day-to-day PA problems, but is a person specifically designated to handle, *inter alia,* all conferences arising out of the bank match program. The L & A worker is provided with a "bank match packet" that contains all the information which caused the city's computer to send out the notice of intent. If the recipient can show at the L & A conference his continuing eligibility for public assistance, for example, by showing that he does not have access to the account

in question or that the account balance has fallen below $1,000, the L & A worker is authorized to stop the termination proceedings.

If unsuccessful at the conference with the L & A worker, the recipient may under state law request a review of the city's action at a state fair hearing. 18 N.Y.C.R.R. Part 358; *see* 45 C.F.R. § 205.-10(a)(1)(ii). According to the city, copies of the bank match packet and any additional evidence that the city intends to present at the fair hearing are sent to the recipient three to four days in advance of the fair hearing. Just as in the conference procedure, the burden at the fair hearing is on the recipient to present evidence to prove continuing eligibility for assistance. If the recipient presents such evidence, appropriate relief is granted; if not, the city's action is upheld and the recipient's benefits are terminated. Thus, once the notice of intent to terminate is generated by the city's computer, the burden is on the person whose benefits are in jeopardy to collect and present the evidence necessary to stop the proceedings.

### 2. *The Notices of Intent.*

Two forms of notice are at issue in this lawsuit: first, the notice sent to plaintiff Melba Henry, which was used by the city from the inception of the program in January 1984 through March 1985 (the "old notice"), and second, a notice changed to include additional, more specific information (the "revised notice").

In both English and Spanish the old notice stated in pertinent part the following:

[The department of income maintenance has information] that you are in possession of assets which exceed the allowable amount for public assistance.

In addition, the notice described the procedure for obtaining a conference, provided the L & A worker's telephone number, and disclosed the individual's right to a fair hearing to contest the city's action. Although it stated that the recipient was "in possession of *assets* which exceed the allowable amount" (emphasis added), the old

notice significantly made no reference either to the fact that the asset referred to was a bank account or to the $1,000 limitation.

The revised notice, changed after this lawsuit was instituted, substitutes for the term "assets" the phrase "a bank account which contain[s] in excess of $1,000". It also cites the applicable state regulation, stating that the maximum amount of money that may be possessed while continuing to remain eligible for public assistance is $1,000. The revised notice, however, lacks specific information such as the name of the bank, the account number, or any information indicating whether the account is individually or jointly held. Even when the city actually possesses the more specific information, that information is, as a matter of administrative convenience, omitted from the revised notice of intent.

B. *The Termination of Melba Henry's Benefits.*

Melba Henry, the mother of three children who, at the commencement of this litigation were aged two, three, and seven, was at all relevant times entirely dependent on PA benefits for herself and her family's subsistence. In August 1984 Henry received a notice of intent to terminate her benefits. The notice was the old notice—that she had "assets" in excess of the "allowable amount"—and was issued pursuant to the bank match program. The underlying information, supplied to the city by Dollar Dry Dock Savings Bank, showed an account of $1,042 with Henry's name on it.

Henry testified that she was confused by the notice and "didn't know what assets they were talking about". Instead of calling the number listed on the notice—that of the L & A worker assigned to handle bank match conferences—Henry called the person she usually called when problems arose concerning her PA benefits: her local caseworker. The caseworker was unfamiliar with the bank match program and was unable to provide Henry with any information concerning the disqualifying account. The caseworker did, however, advise Henry of her right to request a fair hearing.

Still unaware that the "asset" she was being charged with owning was a bank account with a balance exceeding $1,000, Henry requested a fair hearing. That hearing was held on September 10, 1984, and, not surprisingly, Henry, who appeared without counsel, presented neither documents nor witnesses in her defense. The city presented a copy of the computer printout showing her name on the Dollar Dry Dock Savings Bank account reflecting a balance of $1,042. In response, Henry acknowledged that the address and social security number on the account were hers, but she insisted that she did not own any bank account. Given this limited evidence, the New York State Department of Social Services in a "decision after fair hearing" dated October 4, 1984, understandably upheld the city's decision to terminate Henry's benefits.

As a result of the termination of Henry's benefits, Henry and her three children were left with no source of income for approximately six weeks. During that time, Henry borrowed from both friends and strangers in order to feed and clothe herself and her family. On many occasions they went hungry.

Not until the following month was Henry able to gather enough information to refute the allegations of the city which had taken her by surprise at the fair hearing. The disqualifying bank account was in fact a joint account bearing Henry's name and that of one Mary Collins, an elderly neighbor. Approximately three years earlier, Collins had asked Henry to add her name to the account so that if Collins, whose health was failing, should need cash but be unable to visit the bank, Henry could make any necessary withdrawal for her. Collins never intended to confer any right to the money in the account to Henry, but had added Henry's name as a joint owner purely as an accommodation to Collins. Since no need for Henry to make any withdrawal had actually occurred, and since Henry had

never possessed the bankbook, it is not surprising that the district court credited Henry's explanation that she simply had forgotten that the account existed.

Henry reapplied for benefits on November 7, 1984; she also sought to reinstate her benefits through this lawsuit commenced by a complaint dated November 20, 1984.

On November 21, 1984, the district court issued a temporary restraining order restoring Henry's benefits; and a trial on the merits commenced on April 7, 1985.

## C. *The Proceedings Below.*

### 1. *The Issues.*

The court below was faced with Henry's individual claim as well as her class claims. Individually, Henry challenged the legality of the termination of her own PA benefits, raising issues of whether the termination procedures were properly initiated and whether the old notice was lawful.

On behalf of the main class, consisting of all persons who receive or will receive PA benefits, Henry raised issues as to the amount of information that the city should be required to possess before instituting termination procedures, and as to what information must be included in the notice of intent. Plaintiff also alleged the existence of a sub-class of individuals who, like Henry, had their benefits terminated after receiving the old notice. The underlying issues affecting the sub-class were closely related to Henry's individual claim; an additional problem, however, was the appropriate relief to be granted to members of the sub-class should plaintiff succeed in her challenge to the old notice. Finally, the district court was faced with determining whether plaintiff was entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

### 2. *The Evidence.*

In addition to documentary evidence, plaintiff's case consisted of the testimony of Melba Henry, who testified as described above, Mary Collins, who corroborated Henry's story of accommodating her elderly neighbor, and David Katz, a computer expert who testified on the feasibility of including additional, specific information in the city's computer-generated notices.

Defendants presented the testimony of Martin Burdick, the deputy administrator of the New York City Human Resources Administration, Marcia Nissenson, the L & A worker responsible for handling Henry's bank match conference, and Michael Davis, a city employee who was personally familiar with the city's computer system.

Burdick and Nissenson described the administration of the bank match program. Most importantly, their testimony confirmed that termination procedures begin as soon as the PA recipient's name is identified as appearing on an account with a balance that exceeds $1,000 and that this action is taken whether or not the city knows if the account in question is individually or jointly owned. Davis explained how the computer system issues notices of intent.

Plaintiff's computer expert testified that it would take from two to six weeks to change the city's computer system to enable it to issue notices that contain specific information additional to that already included in the revised notice. The city's computer expert disagreed and insisted that the period of two to six weeks would be required merely to investigate the possibility of making the changes requested by plaintiff.

### 3. *The Final Judgment.*

As the proceedings progressed, the district court made various findings of fact and drew certain legal conclusions; it rendered no formal written opinion. Final judgment was signed on June 18, 1985.

Addressing the individual claim, the district court held that defendants' termination of Henry's PA benefits after using the old notice was unlawful, because the old notice failed to contain information necessary for her to prepare a defense and therefore violated state and federal regula-

tions as well as her due process rights. The final judgment directed the city to restore all PA benefits withheld pursuant to the October 4, 1984, decision on Henry's fair hearing. The court also found that Henry's suffering during the period in which she was wrongfully denied benefits entitled her to compensatory damages in the amount of $500.

As to the class claims, the district court certified a class, pursuant to rules 23(c)(1) and (c)(2) of the Federal Rules of Civil Procedure, identifying the members of the class as all individuals who "receive or will receive public assistance payments through the New York City Human Resources Administration or any successor entity" (the "main class") and, in addition, certified a sub-class of individuals consisting of all persons who, like Henry, had their benefits terminated after receiving the old notice.

The relief awarded the main class was both declaratory and injunctive. It concerned (1) the amount of information that the city must possess regarding any particular bank account before initiating termination procedures and (2) the information required to be placed on the notice of intent.

To fashion its relief the district court drew upon evidence presented at trial that described two types of termination procedures. Under what was referred to at trial as the "Type A" procedure, the city, without making any attempt to contact the individual whose benefits are about to be terminated, simply issued a notice of intent advising the individual of its proposed action. This, of course, placed on the PA recipient the burden of stopping the termination. Until the judgment below the city had used the Type A termination procedure in all bank match cases.

Under the "Type B" procedure, the individual whose eligibility was in question was invited to appear at the local income maintenance center for a face-to-face interview prior to initiation of the termination procedures. Thus, under the Type B procedure, before a notice of intent was issued an individual would be afforded an opportunity to clarify any ambiguity.

Under the judgment, the Type A procedure might be used in the bank match program only when the city is in the position to determine that the individual whose benefits are about to be terminated "has a legal interest in the bank account that renders him/her ineligible for public assistance". Such a situation is deemed to exist when the city has information that the individual's name appears on (1) an individual account with a balance that exceeds $1,000; (2) a joint account reflecting a balance exceeding $2,000; or (3) any account (whether or not known to be held jointly or individually) reflecting a balance exceeding $2,000.

In all other cases, *i.e.*, those in which the bank has not provided information indicating whether the account in question is held jointly or individually and the account balance is less than $2,000, the judgment below requires the city to use the Type B procedure, *i.e.*, before sending out a notice of intent, the city must invite the individual to appear at a local income maintenance center "to provide information regarding the ownership of the bank account".

As to the adequacy of the revised notice, the district court found the revised notice to be a vast improvement over the old notice, but held that in order to satisfy statutory and constitutional requirements it must be further revised to include (1) a statement that upon request the city will provide to the class member the number of the disqualifying bank account, the bank branch at which the account is located, the account balance, and, if available, the full title of the bank account, and (2) a statement that "unless proven otherwise, a pro rata share of a jointly held bank account is presumed to be an available resource for public assistance eligibility."

The relief granted to the sub-class required the city to send all members a notice stating that the recipient's benefits may have been wrongfully terminated, that "certain joint, trust and custodial bank accounts are treated differently than individual bank accounts for purposes of public

assistance eligibility", and that the recipients should contact their local income maintenance centers to obtain a review of the decisions which had terminated their benefits. The judgment also required the defendants to restore benefits to any subclass member found upon the review to have been erroneously terminated.

Finally, the district court determined that Henry was a "prevailing plaintiff within the meaning of the civil rights laws" and, accordingly, pursuant to 42 U.S.C. § 1988, awarded her costs, disbursements, and a reasonable attorneys' fee.

On appeal, defendants argue principally that the district court went too far in ruling how the city must administer its bank match program; they challenge, however, in buckshot fashion, each ruling of the court below on both the individual and class claims, as well as the award of attorneys' fees. Plaintiff's cross-appeal concerns only the notice; she argues that the court should have required the city to place even more information on the notice of intent. Contending that her expert established unequivocally the feasibility of her requests, plaintiff asks specifically that the identity of the bank account at issue be placed on the notice instead of merely including a statement that the person can obtain that information upon request.

In short, defendants argue that the district court went too far, while plaintiff argues that it did not go far enough.

## DISCUSSION

In order to decide the specific issues on appeal, we must first focus generally on (1) the circumstances under which the city may lawfully initiate termination procedures and (2) the information that the city must include in its notice of intent. Initially, we consider when it becomes lawful for the city to commence procedures to terminate benefits.

■ Before a bank account or any other resource may be counted toward the $1,000 limitation, it must be actually available for the PA recipient's use for support and maintenance. *See* 45 C.F.R. § 233.-20(a)(3)(ii)(D). This concept of "actual availability" has long played a part in the administration of the social security system. The concept requires that before a resource is taken into account in determining a PA recipient's eligibility, a determination must be made that the PA recipient has "a legal interest in a liquidated sum and the legal ability to make [that] sum available for support and maintenance." *Id.; see Heckler v. Turner*, 470 U.S. 184, 105 S.Ct. 1138, 1147, 84 L.Ed.2d 138 (1985); *Schrader v. Idaho Department of Health and Welfare*, 768 F.2d 1107, 1112 (9th Cir. 1985). Consideration only of those resources that are actually available for current use to the PA recipient for support and maintenance "prevent[s] the States from relying on imputed or unrealizable sources of income artificially to depreciate a recipient's need." *Turner*, 105 S.Ct. at 1148.

■ New York State regulations require that an agency refrain from reducing or terminating any benefit without first verifying that the recipient is, in fact, ineligible for assistance. 18 N.Y.C.R.R. § 351.22(e) (requiring that ineligibility be "verified"); *id.* § 358.9 (requiring that agency review proposed action *prior to* sending out notice). Combined, these two principles establish that a PA recipient's benefits may not be terminated or reduced until the city has first verified that the recipient has the necessary amount in an account that is actually available for support and maintenance.

The city recognizes the validity of the actual availability concept and at trial even alluded to its application in other contexts. For example, witnesses testifying on behalf of the city described the way in which it handles information relating to a PA recipient's change in marital status. Information that a PA recipient has married will trigger an inquiry into the recipient's eligibility status. Rather than assuming that the spouse is bringing funds into the household that are actually available for the PA recipient's support and maintenance, the

city invokes the Type B procedure referred to above and requests that the recipient appear at a local income maintenance center to verify whether, as a result of the marriage, additional funds have become available for support and maintenance.

Similarly, the Type B procedure, a face-to-face conference before commencing termination procedures, is used when the city learns that an additional person is residing with the PA recipient. Again, the city does not merely assume that the person is actually contributing resources to the household, thereby diminishing or eliminating the need and eligibility for PA benefits, but rather conducts an inquiry to verify whether additional resources have become available for support and maintenance.

In both situations described above, the city concedes that because it lacks sufficient information to determine whether there has actually been a change in the PA recipient's eligibility status, taking on the additional administrative burden of the Type B procedure is justified by the harsh consequences that would follow an erroneous deprivation.

■ We think that use of the Type B procedure in the circumstances outlined in the district court judgment is equally justified and for the same reason—to avoid the substantial harm caused by an erroneous deprivation. We also agree with the district court that the city must use the Type B procedure when it does not know whether an account of under $2,000 is held jointly or individually. In the other cases identified in the district court judgment, we agree with the district court that the city is warranted in using the Type A procedure: immediate commencement of termination procedures without the necessity of requesting a face-to-face conference with the PA recipient.

We cannot agree with the city's contention that the Type B procedure is unduly burdensome in those cases specified by the district court. Where, as here, the consequences of erroneous deprivation are potentially so grave, the balance tips decidedly in favor of requiring the additional administrative burden. Requiring the conference procedure will not unduly delay termination proceedings. It is used effectively with changes in marital or joint living status; it can be informal and expeditious; and the PA recipient cannot delay action by not appearing at the conference because failure to appear is, in and of itself, a violation justifying immediate termination of all PA benefits. *See* 18 N.Y.C.R.R. § 351.2(e)(2)(iv).

In sum, we conclude that the district court's judgment specifying those situations in which termination procedures may or may not be initiated is a proper application to the bank match program of the concepts of actual availability and verification as applied in both case law and regulations.

Next we turn our attention to the information that the judgment requires to be included in the notice of intent. The judgment provides that, in order to comport with due process standards, the notice of intent must contain the following six statements:

1) A statement that the city's information indicates that the PA recipient is in possession of a bank account that contains in excess of $1,000;

2) a statement that the maximum amount of money that can be possessed while continuing to remain eligible for assistance is $1,000;

3) a statement citing the applicable city regulations;

4) a statement disclosing how a conference and fair hearing may be obtained;

5) a statement that, upon request, defendants will provide to the PA recipient the number of the bank account, the bank branch at which the account is located, the account balance, and, if available, the full title of the account; and

6) a statement that unless proven otherwise, a prorata share of a jointly held bank account is presumed to be an available resource for purposes of public assistance eligibility.

Until plaintiff began this litigation the city used the old notice, which referred only to the PA recipient's possession of "assets" exceeding the $1,000 limitation. After commencement of this litigation, the city voluntarily added to the notice the statements numbered 1) through 4) above; Judge Griesa ordered that the additional statements numbered 5) and 6) above be added to the notice.

Although the city voluntarily changed its notice of intent after commencement of this litigation, it persists in the contention that the old notice was lawful, and also argues that the additional information required by the district court judgment is unnecessary. The issues, therefore, are (1) whether the district court correctly determined that the old notice was unlawful and (2) whether the court correctly determined that statements 5) and 6) above must be added to the revised notice. We begin this part of the discussion with an overview of the applicable regulatory and constitutional requirements.

Federal regulations require state public assistance plans to provide for a system of hearings whenever, *inter alia*, the decision is made to terminate or reduce a PA recipient's benefits. 45 C.F.R. § 205.10(a)(1); *id.* § 205.10(a)(12)(i). New York State has exercised the option, provided under the federal regulations, of establishing a two-tier hearing system under which the PA recipient has the right, prior to obtaining a state hearing, to a hearing at the city level with the right of appeal to the state agency. 18 N.Y.C.R.R. Part 358; *see* 45 C.F.R. § 205.10(a)(1)(ii).

Where the agency determines that a reduction or termination of benefits is warranted, federal regulations require that the state or local agency give timely and adequate notice of the proposed action. "Adequate" notice is defined as follows:

"Adequate" means a written notice that includes a statement of what action the agency intends to take, the reasons for the intended agency action, the specific regulations supporting such action, explanation of the individual's right to re-

quest an evidentiary hearing * * * and a State agency hearing, and the circumstances under which assistance is continued if a hearing is requested.

45 C.F.R. § 205.10(a)(4)(i)(B). The regulations further provide that at the hearing the PA recipient or his representative shall have the opportunity to, *inter alia*, bring witnesses, "establish all pertinent facts and circumstances", and "question or refute any testimony or evidence, including [the] opportunity to confront and cross-examine adverse witnesses." 45 C.F.R. § 205.10(a)(13)(iii), (iv), (vi).

These regulations were promulgated to implement the holding of the Supreme Court in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). 45 C.F.R. § 205.10(a)(1)(ii). There, the Court recognized the necessity of affording a PA recipient the right to a hearing prior to the termination of benefits. *Goldberg*, 397 U.S. at 264, 90 S.Ct. at 1018. For the hearing to be held in a "meaningful manner", *id.* at 267, 90 S.Ct. at 1020, the Court held that the recipient must "have timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." *Id.* at 267–68, 90 S.Ct. at 1020. The Court went on to highlight the fact that these rights were extremely important in cases in which, as here, "recipients have challenged proposed terminations as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases." *Id.* 397 U.S. at 268, 90 S.Ct. at 1020. What the *Goldberg* Court held, in essence, and what the regulations strive to implement, is that the recipient must be given information sufficient to put him in a position to defend the impending termination of benefits. Keeping this basic objective in mind, we proceed to evaluate both the old and the revised notices.

The old notice, we agree with the court below, was grossly inadequate to inform the PA recipient of the reason for the pro-

posed action and made it difficult, if not impossible, for the PA recipient to defend against the charge. Since the old notice referred only to "assets" and made no mention of ownership of a disqualifying bank account or to the $1,000 limitation, it fell short of the federal regulation's definition of "adequate", which requires a specification of "the reasons for the intended agency action". *See* 45 C.F.R. § 205.10(a)(4)(i)(B).

■ Nothing makes the inadequacy of the old notice clearer than the experience of the named plaintiff, Melba Henry. Without knowing that the "asset" referred to in the notice was a bank account, Henry could not have possibly been able to conduct an investigation that would enable her to refute the charge of ineligibility. The city argues that Henry would have avoided this problem if only she had called the telephone number on the notice. But we cannot fault Henry for contacting the caseworker at her local income maintenance center rather than the designated L & A worker. The ambiguous, ephemeral nature of the old notice virtually guaranteed such a reaction. Faced with such an incomprehensible notice many PA recipients would likely call, not the number on the notice, but the person who handles their day-to-day PA problems. We therefore have no reason to believe, as the city argues, that the reaction of Melba Henry was in any way atypical. In short, we agree with the court below that the old notice was inadequate and, therefore, unlawful.

We turn now to the revised notice and its relationship to the class. Specifically, we consider the question of whether the district court was correct in its rulings that even the revised notice was inadequate and that in order to comport with constitutional and regulatory requirements it was necessary that statements numbered 5) and 6) above be added. Statement 5) requires, in substance, that upon request the account and branch will be disclosed to the PA recipient; statement 6) informs the recipient that joint accounts are treated differently from individual accounts.

■ The basic question is whether the revised notice gives the PA recipient enough information about the impending termination so as to afford him a meaningful opportunity to prepare a defense. We recognize the difficulty of reducing this requirement to specific language required to be placed on a piece of paper. Some forms of notice, such as the old notice here, are clearly inadequate; at the same time it is probably impossible to devise a perfect notice that could not possibly be misunderstood by anyone. We are left therefore with a practical question: whether on balance, taking into account the private interests affected by the city's action, the risk of erroneous deprivation of those interests through the procedures used, and the administrative burden placed on the city, the district court correctly ordered that the additional information be included. *See Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Taking all of these factors into account, we are satisfied that the district court struck a proper balance.

The consequences that would follow an erroneous deprivation after inadequate notice—a loss of income necessary for family subsistence—are grave. The additional information required by the court's order is pertinent, and in many cases necessary, in preparing a defense. Advising the recipient that the bank name and account number can be obtained by calling a designated phone number highlights the reason for termination and points the PA recipient in the right direction to initiate an investigation. Information regarding the different treatment of joint accounts may frequently prove to be critical, for undoubtedly many PA recipients are unaware that the city, absent information to the contrary, would assume access to only one-half of a jointly held account.

On the other side of the balance, the administrative burden of adding two additional sentences to the revised notice is slight. Since the required additional information is uniform, it can be readily incorporated into the computer's programmed

form. Certainly the city cannot demonstrate that printing six paragraphs of information is any more burdensome than printing only four paragraphs of information. On balance therefore, we have little difficulty in concluding that the district court did not err in requiring the city to place the additional information on the notice.

■ We now address the question raised by plaintiff's cross-appeal—should the city be required to place *individualized* information on the notices of intent? · Like the district court, we think not.

The city demonstrated a significant administrative difficulty in including individualized information in each notice of intent. The city's expert, a witness who was personally familiar with the city's computer system, testified that it would take up to six weeks merely to investigate the possibility of modifying the system to enable it to send out notices that contain information about the particular bank account relating to each individual case. Plaintiff's expert, on the other hand, testified as to the feasibility of changing the notice solely on the basis of testimony he had heard that morning. We see little additional benefit in requiring all available details to be in the notice, as opposed to making them available on inquiry after giving adequate notice that termination is proposed based on a disqualifying balance in a bank account. Under these circumstances we find no error in the district court's refusal to order the city to change its computer program to enable it to generate individualized notices. Accordingly, on plaintiff's cross-appeal, we affirm.

We turn next to the relief granted to Henry and to the sub-class. Since Henry does not contest the adequacy of the $500 damage award, we are faced only with the city's contention that Henry suffered no compensable injury. To the extent that the city's argument is based on the notion that the old notice was lawful, it must, for the reasons set forth above, be rejected. To the extent that the city's position is based on the notion that, notwithstanding the legality of the notice, Henry suffered no loss, we disagree.

■ Damages are properly awarded for civil rights violations when the plaintiff has suffered an actual loss as a result of a constitutional deprivation. The purpose of ordering the payment of damages is "to compensate persons for injuries caused by the deprivation of constitutional rights". *Carey v. Piphus*, 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978). It is a basic principle of tort law in general, and of civil rights law in particular, that compensable injuries may include not only monetary losses such as out-of-pocket expenses but also injuries such as "personal humiliation" and "mental anguish". *Memphis Community School District v. Stachura*, — U.S. —, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986). In *Stachura* the Court recognized the broad nature of injuries compensable under the civil rights laws but reversed because the jury might have awarded damages based upon an impermissible consideration of the abstract "value" or importance of a constitutional right. Here, in contrast, plaintiff suffered injuries that were neither abstract nor theoretical; she and her children actually went hungry and were reduced to begging. We therefore have little difficulty in affirming the modest award of $500 in compensatory damages.

■ We turn now to the relief granted the sub-class of individuals who, like Henry, had their benefits terminated after receiving the old form of notice. The district court made no immediate award of monetary relief to the sub-class. Instead, it ordered that notices be sent to all sub-class members stating that their benefits might have been terminated erroneously and required that a phone number be provided where the recipient could obtain a review of the situation. Given the inadequacy of the old notice, it is likely that some individuals, like Henry, had a valid defense to the charge of ineligibility but, caught by surprise, were unable to present it; any such person would have been wrongfully denied benefits. The relief ordered by the district

court is well tailored to correct this result while placing the smallest possible administrative burden on the city. The relief granted the sub-class is therefore affirmed.

 The final question before us is whether the district court properly awarded a reasonable attorneys' fee to plaintiff pursuant to 42 U.S.C. § 1988. Under that section, a prevailing plaintiff is entitled to an award of attorneys' fees unless "special circumstances would render such an award unjust." *Newman v. Piggie Park Enterprises*, 390 U.S. 400, 402, 88 S.Ct 964, 966, 19 L.Ed.2d 1263 (1968) (per curiam). At the outset of this litigation plaintiff sought for herself a reinstatement of benefits and an award of compensatory damages; for the class, she sought in connection with the bank match program changes in the city's decisionmaking practices and in the form of its notice. Since it is clear that Henry has succeeded on not just one but on each "significant" issue involved in this litigation, thereby benefiting both herself and members of both classes, *see Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983), we do not hesitate to affirm the award of attorneys' fees.

## CONCLUSION

In this complex case the district court was faced with a broad challenge to the legality of New York City's bank match program. While we have affirmed the judgment of the district court in all respects, we think it appropriate to point out one deficiency in the proceedings below. Although requested to do so on several occasions, the lower court declined to certify this action as a class action until the proceedings were nearly concluded. As a result, the parties were often at a loss to determine the nature of the proceedings. This failure to identify the issues and certify the classes early in the proceedings not only produced below an atmosphere of confusion, but also made our appellate review more difficult. We urge the district courts in cases such as this to heed the direction of rule 23(c)(1) and make the class certifica-

tion "[a]s soon as practicable after the *commencement* of [the] action". Fed.R. Civ.P. 23(c)(1) (emphasis added). Nevertheless, we are satisfied that a correct result was reached here and that the procedural uncertainty resulting from the delay in class certification caused no prejudice to any of the parties. Accordingly, the judgment appealed from is, in all respects, affirmed.